# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2022AP91 |

| | |
|---|---|
| COMPLETE TITLE: | Richard Teigen and Richard Thom, |
| | Plaintiffs-Respondents-Petitioners, |
| | v. |
| | Wisconsin Elections Commission, |
| | Defendant-Co-Appellant, |
| | Democratic Senatorial Campaign Committee, |
| | Intervenor-Defendant-Co-Appellant, |
| | Disability Rights Wisconsin, |
| | Wisconsin Faith Voices for Justice and |
| | League of Women Voters of Wisconsin, |
| | Intervenors-Defendants-Appellants. |

ON BYPASS FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 8, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 13, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Waukesha |
| JUDGE: | Michael O. Bohren |

JUSTICES:

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court with respect to ¶¶4-10, 12-13, 52-63, and 73-85, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶1-3, 11, 14-51, 64-72, 86, n.29, and 87, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. ROGGENSACK, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. HAGEDORN, J., filed a concurring opinion. ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET and KAROFSKY, JJ., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-co-appellant, there were briefs filed by *Steven C. Kilpatrick*, assistant attorney general, with whom on

the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Steven C. Kilpatrick*.

For the intervenor-defendant-co-appellant, there were briefs filed by *Charles G. Curtis, Jr., Michelle M. (Umberger) Kemp, Will M. Conley, John M. Devaney, Elisabeth C. Frost,* and *Perkins COie, LLP,* Madison and Washington, D.C., and *Elias Law Group LLP,* Washington, D.C. There was an oral argument by *Charles G. Curtis*.

For the intervenors-defendants-appellants, there were briefs filed by *Jeffrey A. Mandell, Douglas M. Poland, Rachel E. Snyder, Carly Gerads, Scott B. Thompson, Mel Barnes,* and *Stafford Rosenbaum LLP,* Madison, and *Law Forward, Inc.,* Madison. There was an oral argument by *Jeffrey A. Mandell*.

For the plaintiffs-respondents-petitioners, there was a brief filed by *Richard M. Esenberg, Brian W. McGrath, Luke N. Berg, Katherine D. Spitz,* and *Wisconsin Institute for Law & Liberty*, Milwaukee. There was an oral argument by *Richard M. Esenberg.*

An amicus curiae brief was filed by *James R. Troupis, Joseph W. Voiland*, and *Troupis Law Office,* Cross Plains, and *Veterans Liberty Law*, Cedarburg, for Senator Ron Johnson. There was an oral argument by *James R. Troupis*.

An amicus curiae brief was filed by *James Bopp, Jr., Michael D. Dean,* and *James Madison Center for Free Speech*, Terre Haute, and *First Freedoms Foundation*, Brookfield, for True the Vote, Inc.

An amicus curiae brief was filed by *Cameron T. Norris, James P. McGlone, Matthew M. Fernholz,* and *Consovoy McCarthy*

2

*PLLC,* Arlington, and *Gramer, Multhauf & Hammes, LLP,* Racine, for Honest Elections Project.

An amicus curiae brief was filed by *Kurt A. Goehre* and *Conway, Olejniczak & Jerry S.C.*, Green Bay, for the Republican National Committee, the National Republican Senatorial Committee, and the Republican Party of Wisconsin.

An amicus curiae brief was filed by *Claire Silverman* and *Maria Davis* for the League of Wisconsin Municipalities.

3

**2022 WI 64**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2022AP91
(L.C. No. 2021CV958)

STATE OF WISCONSIN                    :        IN SUPREME COURT

Richard Teigen and Richard Thom,

       Plaintiffs-Respondents-Petitioners,

   v.

Wisconsin Elections Commission,

       Defendant-Co-Appellant,

Democratic Senatorial Campaign Committee,

       Intervenor-Defendant-Co-Appellant,

Disability Rights Wisconsin, Wisconsin Faith Voices for Justice and League of Women Voters of Wisconsin,

       Intervenors-Defendants-Appellants.

**FILED**

**JUL 8, 2022**

Sheila T. Reiff
Clerk of Supreme Court

---

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court with respect to ¶¶4-10, 12-13, 52-63, and 73-85, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶1-3, 11, 14-51, 64-72, 86, n.29, and 87, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. ROGGENSACK, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. HAGEDORN, J., filed a concurring opinion. ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET and KAROFSKY, JJ., joined.

APPEAL from a judgment and an order of the Circuit Court for Waukesha County, Michael O. Bohren, Judge. *Affirmed*.

¶1 REBECCA GRASSL BRADLEY, J. This case concerns two documents created by employees of the Wisconsin Elections Commission ("WEC"). These documents authorize municipal clerks and local election officials to establish ballot drop boxes. According to one of the documents:

> A drop box is a secure, locked structure operated by local election officials. Voters may deposit their ballot in a drop box at any time after they receive it in the mail up to the time of the last ballot collection Election Day. Ballot drop boxes can be staffed or unstaffed, temporary or permanent.

The other document adds, "[a] family member or another person may . . . return the ballot on behalf of the voter," i.e., an agent of the voter may place the voter's absentee ballot in a drop box.

¶2 Two Wisconsin voters filed this case under Wis. Stat. § 227.40 (2019-20),[1] challenging the validity of these documents.[2] They advanced two arguments: (1) the documents are unpromulgated administrative rules; and (2) under Wisconsin statutes, drop boxes are illegal because a voter must personally mail or deliver in person the voter's absentee ballot to the

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

[2] The Wisconsin voters also sought relief under the Uniform Declaratory Judgment Act, Wis. Stat. § 806.04. We do not address whether relief would be proper had the Wisconsin voters sought relief only under § 806.04.

municipal clerk, not to an inanimate object. The Democratic Senatorial Campaign Committee ("DSCC") and Disability Rights Wisconsin et al. ("DRW") intervened to defend WEC's documents.

¶3 The circuit court granted summary judgment in favor of the Wisconsin voters.[3] The court declared the documents were administrative rules, which had not been properly promulgated, and, among other things, "the use of [ballot] drop boxes, as described in the [documents], is not permitted under Wisconsin law unless the drop box is staffed by the [municipal] clerk and located at the office of the clerk or a properly designated alternate site under Wis. Stat. § 6.855." The circuit court also issued a permanent injunction, requiring WEC to rescind the documents and enjoining WEC from issuing further interpretations of law in conflict with the court's order. An appeal followed, and we granted the Wisconsin voters' petition to bypass the court of appeals.[4]

¶4 We hold the documents are invalid because ballot drop boxes are illegal under Wisconsin statutes. An absentee ballot must be returned by mail or the voter must personally deliver it

---

[3] The Honorable Michael O. Bohren, Waukesha County Circuit Court, presided.

[4] "Elections are the foundation of American government and their integrity is of such monumental importance that any threat to their validity should trigger not only our concern but our prompt action." Trump v. Biden, 2020 WI 91, ¶152, 394 Wis. 2d 629, 951 N.W.2d 568 (Rebecca Grassl Bradley, J., dissenting) (quoting State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W, unpublished order (Wis. June 1, 2020) (Rebecca Grassl Bradley, J., dissenting)).

to the municipal clerk at the clerk's office or a designated alternate site. We do not address whether the documents constitute unpromulgated administrative rules because the documents are invalid regardless.

¶5 The circuit court declared: (1) "an elector must personally mail . . . his or her own absentee ballot"; and (2) only two lawful methods for casting an absentee ballot pursuant to Wis. Stat. § 6.87(4)(b)1. exist, one of which is "for the elector to place the envelope containing the ballot in the mail[.]" The documents do not address whether voters who mail an absentee ballot must personally place the ballot into a mailbox or if a voter's agent may do so. We therefore do not decide at this time whether the law permits a voter's agent to place an absentee ballot in the mail on the voter's behalf.

## I. BACKGROUND

¶6 In spring 2020, many people wanted to minimize their time spent in public spaces due to the COVID-19 pandemic. For this reason, more voters wanted to vote absentee for the spring 2020 election than had voted absentee in past elections. In response, WEC Administrator Meagan Wolfe issued the first document ("Memo one"), which was directed to municipal clerks and other local election officials. The memo states: "[Ballot] drop boxes can be used for voters to return ballots but clerks should ensure they are secure, can be monitored for security purposes, and should be regularly emptied." It also says, "[a] family member or another person may . . . return the [absentee]

4

ballot on behalf of a voter." WEC's commissioners never voted to adopt this memo.

¶7 A few months later, Administrator Wolfe and the assistant administrator issued the second document ("Memo two") ahead of the fall 2020 election. It encourages "creative solutions" to facilitate the use of ballot drop boxes. Specifically, Memo two informs municipal clerks that drop boxes can be "unstaffed," and states "[a]t a minimum, you should have a drop box at your primary municipal building, such as the village hall." WEC commissioners never voted on Memo two either.

¶8 Municipal clerks acted on these memos. Administrator Wolfe avers she is aware of 528 ballot drop boxes utilized for the fall 2020 election. By the spring 2021 election, Administrator Wolfe says municipal clerks and local election officials reported 570 drop boxes, spanning 66 of Wisconsin's 72 counties.

¶9 The Wisconsin voters filed a lawsuit challenging the validity of these memos. In resolving the suit, the circuit court declared, "WEC's Memos are administrative rules under Chapter 227 of the Wisconsin statutes and are invalid . . . because they should have been, but were not, promulgated as rules." It also declared:

> WEC's interpretation of state statutes in the Memos is inconsistent with state law, to the extent they conflict with the following: (1) an elector must personally mail or deliver his or her own absentee ballot, except where the law explicitly authorizes an agent to act on an elector's behalf, (2) the only

5

lawful methods for casting an absentee ballot pursuant to Wis. Stat. § 6.87(4)(b)1. are for the elector to place the envelope containing the ballot in the mail or for the elector to deliver the ballot in person to the municipal clerk, (3) the use of drop boxes, as described in the Memos, is not permitted under Wisconsin law unless the drop box is staffed by the clerk and located at the office of the clerk or a properly designated alternate site under Wis. Stat. § 6.855.

The circuit court permanently enjoined WEC and ordered it to "withdraw the Memos and issue a statement to clerks notifying them that WEC's interpretation of Wis. Stat. §§ 6.87 and 6.855 in the Memos has been declared invalid by this Court[.]" The injunction also ordered WEC not to "issue any further interpretations . . . that conflict[] with . . . §§ 6.87 and 6.855, as described above." The defendants appealed. The Wisconsin voters filed a petition to bypass the court of appeals, which we granted.

## II. STANDARD OF REVIEW

¶10 Two threshold arguments have been raised. First, DSCC argues the Wisconsin voters lack standing. The existence of standing presents a question of law, which we review independently, although we benefit from the circuit court's analysis. Friends of the Black River Forest v. DNR, 2022 WI 52, ¶10, __ Wis. 2d __, __ N.W.2d __ (quoting City of Mayville v. DOA, 2021 WI 57, ¶15, 397 Wis. 2d 496, 960 N.W.2d 416); see also T.L.E.-C. v. S.E., 2021 WI 56, ¶13, 397 Wis. 2d 462, 960 N.W.2d 391 (citing State v. Stephenson, 2020 WI 92, ¶18, 394 Wis. 2d 703, 951 N.W.2d 819).

6

¶11 Second, DRW argues Wisconsin law bars this suit because the Wisconsin voters did not first file their complaint with WEC, which DRW claims Wis. Stat. § 5.06 requires. DRW offers two independent bases for this argument: (1) sovereign immunity and (2) competence.[5] Whether sovereign immunity bars this lawsuit is a question of law. Aesthetic & Cosmetic Plastic Surgery Ctr., LLC v. Wis. Dep't of Trans., 2014 WI App 88, ¶12, 356 Wis. 2d 197, 853 N.W.2d 607 (quoting Canadian Nat'l R.R. v. Noel, 2007 WI App 179, ¶5, 304 Wis. 2d 218, 222-23, 736 N.W.2d 900). Likewise, whether the circuit court was competent to adjudicate this case is a question of law. City of Cedarburg v. Hansen, 2020 WI 11, ¶13, 390 Wis. 2d 109, 938 N.W.2d 463, modified on reconsideration, 2020 WI 45, 391 Wis. 2d 671, 943 N.W.2d 544 (citing City of Eau Claire v. Booth, 2016 WI 65, ¶6, 370 Wis. 2d 595, 882 N.W.2d 738).

¶12 On the merits, we must interpret Wisconsin statutes to determine whether the memos correctly describe the law. Statutory interpretation presents a question of law. See T.L.E.-C., 397 Wis. 2d 462, ¶13 (citing Stephenson, 394 Wis. 2d 703, ¶18).

¶13 Lastly, DRW raises a federal preemption argument. Preemption presents a question of law. Town of Delafield v. Cent. Transp. Kriewaldt, 2020 WI 61, ¶4, 392 Wis. 2d 427, 944

---

[5] DRW conflated these two bases, but we resolve them independently.

N.W.2d 819 (citing Partenfelder v. Rohde, 2014 WI 80, ¶25, 356 Wis. 2d 492, 850 N.W.2d 896).

### III. ANALYSIS

#### A. Threshold Issues

##### 1. The Wisconsin Voters Have Standing

¶14 DSCC argues the Wisconsin voters lack standing, asserting they "have not demonstrated 'a personal stake in the outcome of the controversy' separate and apart from the public at large, nor have they shown they have 'suffered or [are] threatened with an injury to an interest that is legally protectable.'"[6] We reject this argument because the Wisconsin voters do have a "stake in the outcome" and are "affected by the issues in controversy." Wis. Legislature v. Palm, 2020 WI 42, ¶12, 391 Wis. 2d 497, 942 N.W.2d 900. WEC's memos "interfere[] with or impair," or at the very least, "threaten[] to interfere with or impair," the Wisconsin voters' "legal rights and privileges"——specifically, their rights and privileges as registered voters. See Wis. Stat. § 227.40(1). For this reason, the Wisconsin voters have standing under Wisconsin's permissive, policy-oriented approach toward standing.

¶15 DSCC's argument appears to be grounded in the inaccurate assumption that Wisconsin courts follow federal law on standing. For example, DSCC cites a Fifth Circuit case from 2021 rejecting claims "that drive-thru voting hurt the

---

[6] Quoting Marx v. Morris, 2019 WI 34, ¶35, 386 Wis. 2d 122, 925 N.W.2d 112 (emphasis added).

'integrity' of the election process," in violation of the United States Constitution, because the claims were "far too generalized to warrant standing." See Hotze v. Hudspeth, 16 F.4th 1121, 1124 (5th Cir. 2021).

¶16 While standing in federal court is constitutionally confined, in Wisconsin it is limited only by prudential considerations. The United States Constitution extends "[t]he judicial power" only to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. No similar language exists in the Wisconsin Constitution. See Wis. Const. art. VII, § 8 (creating, as a general rule, "original jurisdiction" in the circuit courts over "all matters civil and criminal within this state"). "Because our state constitution lacks the jurisdiction-limiting language of its federal counterpart, 'standing in Wisconsin is not a matter of jurisdiction, but of sound judicial policy.'" Friends of the Black River Forest, __ Wis. 2d __, ¶17 (quoting McConkey v. Van Hollen, 2010 WI 57, ¶15, 326 Wis. 2d 1, 783 N.W.2d 855).[7]

¶17 Judicial policy favors hearing cases presenting "carefully developed and zealously argued" issues. McConkey,

---

[7] Although Justice Brian Hagedorn now criticizes this court's well-established consideration of judicial policy in determining standing, Justice Hagedorn's Concurrence, ¶160, he just joined the majority's expression of the test in Friends of the Black River Forest v. DNR, 2022 WI 52, ¶17, __ Wis. 2d __, __ N.W.2d __ (quoting McConkey v. Van Hollen, 2010 WI 57, ¶15, 326 Wis. 2d 1, 783 N.W.2d 855). Perhaps the court should reconsider its jurisprudence on standing but no party has asked us to do so in this case.

326 Wis. 2d 1, ¶16. To ensure a full vetting of the issues, we typically require plaintiffs to possess some personal stake in the case: "the gist of the requirements relating to standing . . . is to assure that the party seeking relief has alleged a personal stake in the outcome of the controversy as to give rise to that adverseness necessary to sharpen the presentation of issues[.]" Moedern v. McGinnis, 70 Wis. 2d 1056, 1064, 236 N.W.2d 240 (1975). This standard is quite liberal; even "'a trifling interest' may suffice" provided the asserted interest generates sufficient adversity. See McConkey, 326 Wis. 2d 1, ¶15 (quoting Fox v. DHSS, 112 Wis. 2d 514, 524, 334 N.W.2d 532 (1983)).

¶18 In resolving standing challenges, Wisconsin courts may also consider judicial efficiency. Id., ¶¶17-18. The judiciary has "inherent power to protect itself against any action that would . . . materially impair its efficiency." State v. Holmes, 106 Wis. 2d 31, 40, 315 N.W.2d 703 (1982) (quoting In re Court Room, 148 Wis. 109, 121, 134 N.W. 490 (1912)). As a practical matter, courts should not devote time or resources to adjudicating disputes only to ultimately conclude a party is not entitled to any relief.[8]

---

[8] While courts should consider whether relief may be granted, they should not turn an issue of standing into a full adjudication on the merits. See Wis. Voters Alliance v. Wis. Elec. Comm'n, No. 2020AP1930-OA, unpublished order, at 4 (Wis. Dec. 4, 2020) (Roggensack C.J., dissenting) ("We grant petitions to exercise our jurisdiction based on whether the legal issues presented are of state wide concern, not based on the remedies requested." (citation omitted)).

¶19 Against the backdrop of these policies, we have developed a two-prong test for standing to challenge an agency action under chapter 227 of the Wisconsin statutes. See Friends of the Black River Forest, __ Wis. 2d __, ¶18 (quoting Wisconsin's Env't Decade, Inc. v. Pub. Serv. Comm'n of Wis. (WED), 69 Wis. 2d 1, 10, 230 N.W.2d 243 (1975)). In WED, this court described the elements of the inquiry as follows: "(1) Does the challenged action cause the petitioner injury in fact? and (2) is the interest allegedly injured arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question?" Id. (citing Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)).

¶20 Under the first prong, "injury in fact," "we ask 'whether the petition alleges injuries that are a direct result of the agency action.'" Friends of the Black River Forest, __ Wis. 2d __, ¶21 (quoting WED, 69 Wis. 2d at 13). This prong presents a low bar. "[A]n '[i]njury alleged, which is remote in time or which will only occur as an end result of a sequence of events set in motion by the agency action challenged, can be a sufficiently direct result of the agency's decision to serve as a basis for standing.'" Id. (quoting WED, 69 Wis. 2d at 14 (second modification in the original)). Under the second prong, "we ask whether 'the injury is to an interest which the law recognizes or seeks to regulate or protect.'" Id., ¶23 (quoting Waste Mgmt. of Wis., Inc. v. DNR, 144 Wis. 2d 499, 505, 424 N.W.2d 685 (1988)). Recently, in Friends of the Black River

11

*Forest*, we recognized "the 'zone of interests' terminology [for the second prong] is untethered to the text of Wis. Stat. ch. 227[.]"[9] *Id.*, ¶25. We explained, "determination of whether a statute protects, recognizes, or regulates the asserted interest is a purely statutory inquiry, from which the judicially subjective consideration of the 'zone of interests' is properly omitted." *Id.*

¶21 The Wisconsin voters allege they have suffered an injury in fact to their right to vote. *See* Wis. Stat. § 6.84(1) ("The legislature finds that voting is a constitutional right, the vigorous exercise of which should be strongly encouraged."). As the Wisconsin voters argue, "voters[] are entitled to have the elections in which they participate administered properly under the law. Allowing WEC to administer the 2022 elections in a manner other than that required by law causes doubts about the fairness of the elections and erodes voter confidence in the electoral process." Similarly, the Republican National Committee et al., an amicus curiae, emphasizes, "[e]lections are one of the most important features of our Republic, and upholding the rules and procedures prescribed for elections,

---

[9] *Friends of the Black River Forest* involved a challenge to an agency action under Wis. Stat. §§ 227.52 and 227.53. With respect to standing, the case is analogous to this dispute. Many of the cases on which we relied in *Friends of the Black River Forest* discuss standing under chapter 227 of the Wisconsin statutes generally. *See* *Foley-Ciccantelli v. Bishop's Grove Condominium Ass'n, Inc.*, 2011 WI 36, ¶¶43–44, 333 Wis. 2d 402, 797 N.W.2d 789 (lead op.) (suggesting the same framework applies for "an administrative rule or decision").

12

according to the laws enacted by the Legislature, reinforces the sanctity of the rule of law and reassures all Americans of the integrity of our elections." We agree.

¶22 If the right to vote is to have any meaning at all, elections must be conducted according to law. Throughout history, tyrants have claimed electoral victory via elections conducted in violation of governing law. For example, Saddam Hussein was reportedly elected in 2002 by a unanimous vote of all eligible voters in Iraq (11,445,638 people).[10] Examples of such corruption are replete in history. In the 21st century, North Korean leader Kim Jong-un was elected in 2014 with 100% of the vote while his father, Kim Jong-il, previously won 99.9% of the vote.[11] Former President of Cuba, Raul Castro, won 99.4% of the vote in 2008 while Syrian President Bashar al-Assad was elected with 97.6% of the vote in 2007. Even if citizens of such nations are allowed to check a box on a ballot, they possess only a hollow right.[12] Their rulers derive their power from force and fraud, not the people's consent. By contrast, in

---

[10] Saddam Scores 100% in Leadership Ballot, The Guardian (Oct. 16, 2002), https://www.theguardian.com/world/2002/oct/16/iraq.

[11] The World of 100% Election Victories, BBC (Mar. 11, 2014), https://www.bbc.com/news/blogs-magazine-monitor-26527422.

[12] Justice Hagedorn seems to disagree, indicating the right to vote encompasses nothing more than the mere ability to cast a ballot. He fails to recognize that a lawful vote loses its operative effect if the election is not conducted in accordance with the rule of law.

Wisconsin elected officials "deriv[e] their just powers from the consent of the governed." See Wis. Const. art. I, § 1.

¶23 The right to vote presupposes the rule of law governs elections. If elections are conducted outside of the law, the people have not conferred their consent on the government. Such elections are unlawful and their results are illegitimate. "If an election . . . can be procured by a party through artifice or corruption, the Government may be the choice of a party for its own ends, not of the nation for the national good." John Adams, Inaugural Address in the City of Philadelphia (Mar. 4, 1797), reprinted in Inaugural Addresses of the Presidents of the United States at 10 (1989).

¶24 The Wisconsin voters' injury in fact is substantially more concrete than the "remote" injuries we have recognized as sufficient in the past. Friends of the Black River Forest, __ Wis. 2d __, ¶21 (quoting WED, 69 Wis. 2d at 14). The record indicates hundreds of ballot drop boxes have been set up in past elections, prompted by the memos, and thousands of votes have been cast via this unlawful method, thereby directly harming the Wisconsin voters. The illegality of these drop boxes weakens the people's faith that the election produced an outcome reflective of their will. The Wisconsin voters, and all lawful voters, are injured when the institution charged with administering Wisconsin elections does not follow the law, leaving the results in question.

¶25 DSCC misunderstands the nature of the Wisconsin voters' injury in fact. It argues the Wisconsin voters cannot

14

show their votes were diluted by unlawful votes. It states, "it is equally likely that any such [unlawful] voters may vote for the same candidates who[m] [the Wisconsin voters] support, which would seem to benefit, not harm them." The Wisconsin voters' injury, however, is more nuanced than DSCC suggests. DSCC's claim about "equal" likelihood is pure speculation. In contrast, the failure to follow election laws is a fact which forces everyone——even DSCC——to question the legitimacy of election results. Electoral outcomes obtained by unlawful procedures corrupt the institution of voting, degrading the very foundation of free government. Unlawful votes do not dilute lawful votes so much as they pollute them, which in turn pollutes the integrity of the results. See Clark v. Quick, 36 N.E.2d 563, 566 (Ill. 1941) ("There is nothing in the record before us to indicate that any of [the absentee ballots] were actually tampered with by any unauthorized person, but it is entirely obvious that the opportunity to do so was present."). When the level of pollution is high enough, the fog creates obscurity, and the institution of voting loses its credibility as a method of ensuring the people's continued consent to be governed. See State ex rel. Bell v. Conness, 106 Wis. 425, 428, 82 N.W. 288 (1900) ("He failed to show that he received a majority of the votes cast at the election, but he succeeded in showing a condition of affairs that taints the whole proceeding and calls for careful consideration. The purity and integrity of elections is a matter of such prime importance, and affects so many important interests, that the courts ought never to

15

hesitate, when the opportunity is offered, to test them by the strictest legal standards."). A man with an obscured vote may as well be "a man without a vote," and without the opportunity for judicial review, such a man "is without protection; he is virtually helpless." See 106 Cong. Rec. 5082, 5117 (1960) (statement of Sen. Lyndon B. Johnson).

¶26 DSCC quotes this court's statement in McConkey that it was "troubled" by "broad general voter standing[.]" 326 Wis. 2d 1, ¶17. For context, that case involved a voter challenge to a process by which the people of Wisconsin adopted the following constitutional amendment in 2006:

> Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state.

Wis. Const. art. XIII, § 13, superseded by Obergefell v. Hodges, 576 U.S. 644 (2015). "McConkey claimed that the two sentences of the marriage amendment constituted two amendments, not one, and that because voters were not able to vote for or against each sentence, the marriage amendment was not validly adopted." McConkey, 326 Wis. 2d 1, ¶2. McConkey conceded if he would have been able to vote on each individual sentence, he would have voted "no" on both. Id., ¶14. On this basis, the attorney general challenged McConkey's standing, claiming, "he suffered no actual injury to a legally protectable interest." Id. McConkey maintained his "basic voting . . . rights" were violated. Id.

16

¶27 McConkey does not support DSCC's argument. While this court was "troubled," it nonetheless proceeded to decide the case: "whether as a matter of judicial policy, or because McConkey has at least a trifling interest in his voting rights, we believe the unique circumstances of this case render the merits of McConkey's claim fit for adjudication." Id., ¶17. The injury in fact McConkey claimed to suffer is analogous to the injury in fact suffered by the Wisconsin voters; both plaintiffs claim proper voting procedures were not followed.

¶28 DSCC also argues "[t]heir voting rights are in no sense 'diluted' by other voters' reliance on carefully monitored secure [ballot] drop boxes under local municipal clerks' jurisdiction, custody, and control." The memos, however, purport to authorize unstaffed drop boxes as lawful means of returning ballots. Even if secured and monitored, a drop box falls short of the statutorily-recognized security surrounding a polling place. See Wis. Stat. § 6.84(1) ("[V]oting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place.").

¶29 The Wisconsin voters satisfy the second standing prong as well. "[T]he law recognizes" and "seeks to . . . protect" the Wisconsin voters' right to vote. See Friends of the Black River Forest, __ Wis. 2d __, ¶23 (quoting Waste Mgmt., 144 Wis. 2d at 505). Wisconsin Stat. § 227.40(1) affords them relief because the memos "interfere[] with or impair[]," or at the very least, "threaten[] to interfere with or impair," their "legal rights and privileges[.]"

17

¶30 A broader review of judicial policy supports our application of the two-prong test. Like McConkey, this case has been "zealously argued," demonstrating the Wisconsin voters' interest in their right to vote is more than merely "trifling[.]" See 326 Wis. 2d 1, ¶18. We can discern no negative impact on "judicial efficiency" stemming from our decision to resolve it. Id.

¶31 Lastly, "as a law development court," we owe the public an answer to the important questions of law this case raises.[13] Id. "The right of voting for representatives is the primary right by which other rights are protected." Thomas Paine, Dissertation on First Principles of Government (1795), reprinted in Thomas Paine: Rights of Man, Common Sense and Other Political Writings 398 (2008). As the United States Supreme Court has recognized, "[n]o right is more precious in a free country than that of having a voice in the election of those who make laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17 (1964). Unlawfully conducted elections threaten to diminish or even eliminate some voices, destabilizing the very foundation of

---

[13] "Since the 2020 presidential election, many Wisconsin voters have raised serious concerns about the conduct of elections because of directives given by the Wisconsin Elections Commission (WEC) to the municipal clerks who run the elections. We have been petitioned repeatedly to accept cases that address very similar concerns." Kleefisch v. Wis. Elections Comm'n, No. 2021AP1976-OA, unpublished order, at 1-2 (Wis. Feb. 4, 2022) (Roggensack, J., dissenting).

18

free government. The Wisconsin voters have standing to ensure they retain their electoral voices. See generally Trump v. Evers, No. 2020AP1971-OA, unpublished order, at 6 (Wis. Dec. 3, 2020) (Rebecca Grassl Bradley, J., dissenting) ("[T]he integrity of every election will be tarnished by the public's mistrust until the Wisconsin Supreme Court accepts its responsibility to declare what the election laws say.").

¶32 Justice Brian Hagedorn disagrees with our standing analysis, proffering an alternative basis for standing divined from searching the penumbra of Wis. Stat. § 5.06.[14] Although § 5.06 appears nowhere in the complaint[15] and sets forth specific procedures that were never invoked, Justice Hagedorn concludes it nevertheless confers standing on the Wisconsin voters.[16] It can't.

---

[14] Justice Hagedorn's Concurrence, ¶164.

[15] Pointing out that § 5.06 appears nowhere in the complaint isn't a "complaint"; it's just a fact. Id., ¶164 n.3.

[16] Justice Hagedorn asserts the Wis. Stat. § 5.06 standing argument is "in their brief[.]" Id. He continues, "[they] unquestionably" "raise[d]" this argument. Id.

19

¶33 Wisconsin Stat. § 5.06(1) allows "any elector" to file "a written sworn complaint" with WEC if the elector "believes that a decision or action" of "an election official" related to the "conduct of elections is contrary to law[.]" "The commission may conduct a hearing on the matter in the manner prescribed for treatment of contested cases under ch. 227 if it believes such action to be appropriate." § 5.06(1). The Wisconsin voters, however, have not brought a case against any local election official but only against WEC—-in circuit court. As we explain in greater detail below, it would be nonsensical to have WEC adjudicate a claim against itself under Wis. Stat. § 5.06(1).

¶34 If Wis. Stat. § 5.06(1) is the only source of the Wisconsin voters' legal right to sue, their failure to first file the complaint with WEC is no minor matter. Section 5.06(2) declares, "[n]o person who is authorized to file a complaint

---

The portion of the Wisconsin voters' response brief dealing with standing is about two pages. Those two pages have two sentences on Wis. Stat. § 5.06: (1) "Wis. Stat. § 5.06 recognizes that 'any elector' has an interest in raising violations of the election laws"; and (2) "The § 5.06 process does not apply here, for reasons explained below, infra Part IV.B, but § 5.06 shows that electors have a 'right' and interest in elections conducted in accordance with state law." § 5.06 "recognizes" or "shows" that the electors have a "right" to ensure local election officials comply with the law, but on its face the statute simply does not confer a right relevant to the claims brought in this case. In contrast, Wis. Stat. § 6.84(1) includes a legislative "find[ing]" that "voting is a constitutional right[.]" Justice Hagedorn dismisses this language as merely an expression of policy, with apparently no operative effect. A right that lacks a vehicle for vindication is a hollow one.

under sub. (1), other than the attorney general or a district attorney, may commence an action or proceeding to test the validity of any decision, action or failure to act on the part of any election official with respect to any matter specified in sub. (1) without first filing a complaint under sub. (1), nor prior to disposition of the complaint by the commission." No one suggests the Wisconsin voters are not "person[s] . . . authorized to file a complaint under sub. (1)." § 5.06(2). As Justice Hagedorn acknowledges, "§ 5.06 gives [Wisconsin voters] a statutory right to have local election officials in the area[s] where [they] live[] comply with election laws."[17] That statute says "the elector may file a written sworn complaint with the commission requesting that <u>the official be required to conform his or her conduct to the law</u>, be restrained from taking any action inconsistent with the law or be required to correct any action or decision inconsistent with the law or any abuse of the discretion vested in him or her by law." § 5.06 (emphasis added). But § 5.06 says nothing about filing a complaint in order to force WEC to correct any action it make take or any decision it may make, which are inconsistent with the law. If § 5.06 does not apply to the Wisconsin voters' complaint against WEC, then how could it confer standing? Justice Hagedorn does not explain.

¶35 Justice Hagedorn's cognitively dissonant criticisms of our standing analysis apply equally to his own. He says our

---

[17] Justice Hagedorn's Concurrence, ¶164.

21

standing analysis "suggests [we] create[] broad voter standing against any election official or WEC by any elector for nearly any purported violation of any election law."[18]  But Justice Hagedorn articulates an indistinguishably broad basis for standing, concluding the Wisconsin voters have "a legal right protected by Wis. Stat. § 5.06 to have local election officials in [their] area comply with the law."[19]  He complains our standing analysis is not "tether[ed] . . . to an on-point text[.]"[20]  But our analysis is "tethered" to Wis. Stat. § 6.84(1), which incontrovertibly applies to the Wisconsin voters, while Justice Hagedorn's analysis is tethered only to a concededly inapplicable statute.  Unlike our standing analysis, Justice Hagedorn's penumbra standing is not limited to election disputes but logically extends across the Wisconsin statutes.[21]

¶36 Even under the stricter standing test federal courts apply, impairment of the right to vote has been deemed sufficient to confer standing.  While so-called "generalized grievances" "do not normally constitute a particularized injury necessary to establish standing," "the fact that 'a harm is

---

[18] Id., ¶167.

[19] Id., ¶165.

[20] Id., ¶167.

[21] Justice Hagedorn insists his "standing analysis applies only to challenges under Wis. Stat. § 227.40(1) to WEC rules and guidance documents when that guidance threatens to cause local election officials to behave illegally[.]"  Id., ¶167 n.8.  His reasoning logically extends further, notwithstanding his artificial narrowing in a footnote.

22

widely shared does not necessarily render it a generalized grievance.'" Donald J. Trump for President, Inc. v. Bullock, 491 F. Supp. 3d 814, 828 (D. Mont. 2020) (quoting Novak v. United States, 795 F.3d 1012, 1018 (9th Cir. 2015)). "In fact, the [United States] Supreme Court has been clear that 'where a large number of voters suffer interference with voting rights' the interests related to that are sufficiently concrete to obtain the standing necessary to seek redress in an Article III Court." Id. (quoting F.E.C. v. Akins, 524 U.S. 11, 24 (1998)); see also id. ("Because the alleged injuries to the members' voting rights at issue in this case could conceivably be asserted by any Montanan does not eradicate the standing necessary to assert these claims. On the contrary, the Supreme Court has repeatedly enumerated the principle that claims alleging a violation of the right to vote can constitute an injury in fact despite the widespread reach of the conduct at issue."). Wisconsin voters have alleged an injury to their right to vote sufficient to confer standing.

### 2. The Law Does Not Require Wisconsin Voters to File Their Complaint Against WEC with WEC

¶37 Article IV, Section 27 of the Wisconsin Constitution provides: "The legislature shall direct by law in what manner and in what courts suits may be brought against the state." "From this provision the rule developed that the state cannot be sued without its consent." Lister v. Bd. of Regents of Univ. of Wis. Sys., 72 Wis. 2d 282, 291, 240 N.W.2d 610 (1976). DRW, quoting part of this sentence from Lister, argues sovereign

23

immunity bars this lawsuit because the Wisconsin voters did not first file their complaint with WEC, which DRW asserts is a jurisdictional prerequisite under Wis. Stat. § 5.06(1).

¶38 Importantly, the only party that could claim to represent the sovereign in this case——WEC——has abandoned any sovereign immunity argument. In its answer, WEC asserted, "[s]ome of [the Wisconsin voters'] claims are barred by sovereign immunity," but it did not say which ones. WEC did not discuss sovereign immunity at all in its briefing. When asked for WEC's position on this issue during oral argument before this court, WEC's attorney responded:

> Counsel: Well, to be consistent we did not take a position on it one way or the other in briefing, and I'm not going to take a position on behalf of the Commission in oral argument either, so it's a "no position" type of response, for standing and for sovereign immunity, because although we raised it, we're content with the other parties pushing that forward. We chose for strategic purposes to focus our briefs on other things.

> Court: That leaves me perplexed. Do you agree with their standing and sovereign immunity arguments, even though you are not advancing them? I don't want to necessarily pin you down, but I do want clarity. Revisit that answer, if you will.

> Counsel: I understand you don't like the non-answer that I provided. But the position of the Commission is, yes, we raised them in the answer, but we chose not to put them forward in our brief. We did not choose to adopt by incorporation or by reference those arguments; we did not say we are in disagreement with them either.

24

DRW's argument fails because a private party cannot raise and maintain an affirmative defense that belongs to the State.

¶39 "Sovereign immunity is a defense which can be raised by the state alone and does not go to the merits or primary object of the action. For this reason, sovereign immunity is a defense to personal jurisdiction which can be waived." City of Kenosha v. State, 35 Wis. 2d 317, 328, 151 N.W.2d 36 (1967) (emphasis added); Cords v. State, 62 Wis. 2d 42, 46, 214 Wis. 2d 405 (1974) ("The general rule in Wisconsin . . . is that sovereign immunity is a defense to the personal jurisdiction of the court which can be waived. Objection to personal jurisdiction must be raised specifically or be deemed waived. It is not sufficient to make a general demurrer that the complaint does not state facts sufficient to constitute a cause of action.").

¶40 DRW does not address City of Kenosha or Cords, instead claiming in conclusory fashion, "because sovereign immunity is a jurisdictional bar to the court's jurisdiction, it is properly raised at any juncture, and, once raised, must be adjudicated before the merits." The two cases DRW cites in support of this proposition have nothing to do with sovereign immunity (the phrase does not even appear in the opinions), and the cases are actually about subject matter jurisdiction, not personal jurisdiction.

¶41 The first case DRW cites, Bartus v. DHSS, states:

Jurisdictional challenges may be raised at any juncture during a court proceeding. In the instant

25

case, the circuit court was reviewing the propriety of a Department decision to revoke a probationer's term for failure to pay restitution. Bartus's jurisdictional challenge to the 1988 sentence which imposed the restitution, was therefore central to the subject matter jurisdiction of the court on review.

176 Wis. 2d 1063, 1082-83, 501 N.W.2d 419 (1993) (emphasis added). Bartus merely recites a well-known rule, repeated in many cases, that arguments against subject matter jurisdiction cannot be forfeited or waived. See City of Cedarburg, 390 Wis. 2d 109, ¶49 (citing Booth, 370 Wis. 2d 595, ¶1); see also United States v. Cotton, 535 U.S. 625, 630 (2002) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."). Equally well established is the rule that personal jurisdiction can be forfeited or waived. Wis. Stat. § (Rule) 802.06(8)(a).

¶42 The only other case DRW cites in support of its claim that sovereign immunity can raised at any juncture similarly demonstrates DRW's failure to distinguish between subject matter jurisdiction and personal jurisdiction. See Harrigan v. Gilchrist, 121 Wis. 127, 224, 99 N.W. 909 (1904) ("A challenge to the jurisdiction of the trial court of the subject matter of the action is proper at any time[.]" (Emphasis added)).

¶43 DRW is not a state agency, so it cannot assert sovereign immunity. Although WEC asserted in its answer that sovereign immunity barred "some" of the Wisconsin voters' claims, it did not say which ones. No reasonable judge could view WEC's briefing and answers at oral argument as maintaining a sovereign immunity defense. WEC's attorney even said at oral

26

argument that WEC takes "no position" on the matter. Although DRW argued sovereign immunity in its brief, WEC's attorney demurred at oral argument: "We did not choose to adopt by incorporation or by reference those arguments." Such statements conflict with any claimed refusal to submit to a court's jurisdiction. We conclude WEC knowingly abandoned, and therefore waived, sovereign immunity.

¶44 At best, DRW's objection implicates the court's competency, which lacks any constitutional importance. "[S]ubject matter jurisdiction and competence are related but distinct concepts." City of Cedarburg, 390 Wis. 2d 109, ¶49. "Subject matter jurisdiction . . . refers 'to the power of a . . . court to decide certain types of actions.'" Booth, 370 Wis. 2d 595, ¶7 (quoting State v. Smith, 2005 WI 104, ¶18, 283 Wis. 2d 57, 699 N.W.2d 508). "In other words, subject matter jurisdiction is about the type or category of case brought." City of Cedarburg, 390 Wis. 2d 109, ¶49. In contrast, "[c]ompetence . . . is about a court's ability to exercise its jurisdiction in an individual case." Id. With few exceptions, "a circuit court is never without subject matter jurisdiction;" however, "[a] circuit court's ability to exercise its subject matter jurisdiction in individual cases . . . may be affected by noncompliance with statutory requirements pertaining to the invocation of that jurisdiction." See Booth, 370 Wis. 2d 595, ¶12 (quoting Village of Trempealeau v. Mikrut, 2004 WI 79, ¶¶1- 2, 273 Wis. 2d 76, 681 N.W.2d 190). Noncompliance with a required statutory procedure can trigger a competence question,

27

but a lack of competence is not jurisdictional. <u>City of Cedarburg</u>, 390 Wis. 2d 109, ¶47 (citing <u>Mikrut</u>, 273 Wis. 2d 76, ¶¶12, 34).

¶45 DRW's argument is underdeveloped, perhaps because it spent large swaths of its briefing trying to create a constitutional issue when one does not exist. We need not address underdeveloped arguments. <u>Papa v. Wis. Dep't of Health Servs.</u>, 2020 WI 66, ¶42 n.15, 393 Wis. 2d 1, 946 N.W.2d 17. We nonetheless choose to resolve this one because of the issue's importance in the context of election law.

¶46 DRW cites Wis. Stat. § 5.06, which states, in relevant part:

> (1) Whenever any elector of a jurisdiction or district served by an election official believes that a decision or action of the official or the failure of the official to act with respect to any matter concerning . . . election administration or conduct of elections is contrary to law, or the official has abused the discretion vested in him or her by law with respect to any such matter, the elector may file a written sworn complaint with the commission requesting that the official be required to conform his or her conduct to the law, be restrained from taking any action inconsistent with the law or be required to correct any action or decision inconsistent with the law or any abuse of the discretion vested in him or her by law.

> (2) No person who is authorized to file a complaint under sub. (1), other than the attorney general or a district attorney, may commence an action or proceeding to test the validity of any decision, action or failure to act on the part of any election official with respect to any matter specified in sub. (1) without first filing a complaint under sub. (1), nor prior to disposition of the complaint by the commission. . . .

28

According to DRW, the law bars the Wisconsin voters' complaint against WEC because they did not first file it with WEC. Section 5.06, read in context, does not mean what DRW claims. See Brey v. State Farm Mut. Auto Ins. Co., 2022 WI 7, ¶11, 400 Wis. 2d 417, 970 N.W.2d 1 (explaining statutes are read in context).

¶47 First, Wis. Stat. § 5.06(1) applies only to complaints against "election official[s]." "Election officials" are specific "individuals" (not "person[s]")[22] who are "charged with any duties relating to the conduct of an election." Wis. Stat. § 5.02(4e). The Wisconsin voters brought this lawsuit against WEC, not any individual, alleging WEC's memos do not comport with the law. "In chs. 5 to 10 and 12 [of the Wisconsin statutes]," the word "commission" is used to refer to WEC. Wis. Stat. § 5.025. Section 5.06 does not require voters to complain to the "commission" when they believe WEC has violated the law——only when they believe an "election official" has. Intuitively, this distinction makes sense: "No man is allowed to be a judge in his own cause; because his interest will certainly bias his judgment, and, not improbably, corrupt his integrity." The Federalist No. 10, at 107 (James Madison) (John C. Hamilton ed., 1882); see also The Code of Justinian 3.5.1 (Valens, et al. 378) ("[N]o one shall act as judge in his own case, or interpret the law for himself, as it would be very unjust to give anyone the

---

[22] See Wis. Stat. § 990.01(26) ("'Person' includes all partnerships, associations and bodies politic or corporate.").

right to render a decision in an affair which is his own."). DRW's reliance on cases involving claims against election officials——not WEC——is misplaced. See Kuechmann v. Sch. Dist. of La Crosse, 170 Wis. 2d 218, 487 N.W.2d 639 (Ct. App. 1992).

¶48 Second, the remedies WEC can impose under Wis. Stat. § 5.06(6) would be senseless if they were applied by WEC against itself. Is WEC supposed to "order" itself to "conform" its (not "his or her") "conduct to the law"? § 5.06(1). Can WEC order itself "restrain[ed]" or "require[]" itself to "correct any action or decision" it has taken that is "inconsistent with the law"? Id. The plain language of § 5.06(6) does not contemplate giving an election official a chance to reconsider the official's position; it contemplates WEC issuing binding directives to such officials.

¶49 Third, the legislature knows how to write a statute accomplishing the work DRW would have Wis. Stat. § 5.06 perform. See State v. Yakich, 2022 WI 8, ¶24, 400 Wis. 2d 549, 970 N.W.2d 12 (explaining plain meaning may be derived by looking at differences between two statutes and noting "the legislature knew how to draft [different] language" (quoting Milwaukee J. Sentinel v. City of Milwaukee, 2012 WI 65, ¶¶36-37, 341 Wis. 2d 607, 815 N.W.2d 367) (modification in the original)). For example, Wis. Stat. § 68.09(2), which governs municipal administrative review, states, "[a] review under this section may be made by the officer, employee, agent, agency, committee, board, commission or body who made the initial determination." No similar explicit language appears in § 5.06. The

30

commissioners of WEC guard elections; if the legislature wanted the guards to guard themselves, it would have drafted § 5.06 to mirror § 68.09(2).[23]

¶50 Fourth, the Wisconsin voters filed this case under Wis. Stat. § 227.40. Subsection (1) of that statute states, "[a] declaratory judgment may be rendered whether or not the plaintiff has first requested the agency to pass upon the validity of the rule or guidance document in question." Although Wis. Stat. § 5.06 could be construed to conflict with § 227.40(1), such a reading would be erroneous. When reasonably possible, we read statutes in harmony, and a harmonious reading is quite reasonable in this case. See T.L.E.-C., 397 Wis. 2d 462, ¶30 ("The statutory provisions we construe exist in harmony."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). Accordingly, we need not consider DRW's argument that § 5.06 is a more specific statute that trumps § 227.40.[24] See Milwaukee Dist. Council 48 v.

---

[23] The Wisconsin voters ask, "quis custodiet ipsos custodes?" Translated to English, "who will be guarding the guards?" See The Satires of Juvenal 78 (Rolfe Humphries trans., 1958) (emphasis removed).

[24] If we were to address the specific-general canon on which defendants rely, which statute should govern is unclear. Wisconsin Stat. § 5.06 is more specific in the sense that it references election disputes, but Wis. Stat. § 227.40 is more specific in governing judicial review of administrative rules and guidance documents.

Milwaukee County, 2019 WI 24, ¶11, 385 Wis. 2d 748, 924 N.W.2d 153 ("Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." (quoting State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110)); Scalia & Garner, Reading Law, at 183 (explaining the general-specific canon applies "when conflicting provisions simply cannot be reconciled").

¶51 For each of these reasons, we reject DRW's argument. Whether framed in terms of sovereign immunity or competency, it fails. Neither the statutes nor judicial policy precludes this court from resolving the Wisconsin voters' claims against WEC.

## B. The Merits

¶52 WEC's staff may have been trying to make voting as easy as possible during the pandemic, but whatever their motivations, WEC must follow Wisconsin statutes. Good intentions never override the law.[25]

---

[25] Justice Ann Walsh Bradley accuses the court of "erect[ing] yet another barrier for voters," dissent, ¶205, but to the extent any "barriers" to voting exist, they are of the legislature's making. Establishing rules governing the casting of ballots outside of election day rests solely within the power of the people's representatives because such regulations affect only the privilege of absentee voting and not the right to vote itself. Justice Ann Walsh Bradley says "[a] ballot drop box is a simple and perfectly legal solution to make voting easier[.]" Id., ¶207. While they might be a simple solution, the decision to devise solutions to make voting easier belongs to the legislature, not WEC and certainly not the judiciary. While the dissenters would permit ballot drop boxes, the court must

### 1. Legislative Policy Directs Us to Take a Skeptical View of Absentee Voting

¶53 Subchapter IV of chapter 6 of the Wisconsin statutes begins with a statement of legislative policy that cannot be reconciled with the statements of policy contained in WEC's memos:

> LEGISLATIVE POLICY. The legislature finds that voting is a constitutional right, the vigorous exercise of which should be strongly encouraged. In contrast, voting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place. The legislature finds that the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse; to prevent overzealous solicitation of absent electors who may prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses.

Wis. Stat. § 6.84(1); see also Mays v. LaRose, 951 F.3d 775, 792 (6th Cir. 2020) ("[T]here is no constitutional right to an absentee ballot." (citing McDonald v. Bd. of Elections Comm'rs of Chi., 394 U.S. 802, 807-09 (1969)). The statutory requirements governing absentee voting must be completely satisfied or ballots may not be counted:

> INTERPRETATION. Notwithstanding s. 5.01 (1), with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87 (3) to (7) and 9.01 (1) (b) 2. and 4. shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election.

---

respect the constitutional restraints on our power and refuse to act as a super-legislature. It poses a grave threat to democracy to mislead the people into believing we are one.

§ 6.84(2).    "[M]andatory" election requirements "must be strictly adhered to" and "strictly observed."  State ex rel. Ahlgrimm v. State Elections Bd., 82 Wis. 2d 585, 592-93, 263 N.W.2d 152 (1978).

¶54 Despite these provisions, no defendant can point to any statute authorizing ballot drop boxes; instead, the defendants argue no statute expressly prohibits them.  The absence of an express prohibition, however, does not mean drop boxes comport with "the procedures specified" in the election laws.  Wis. Stat. § 6.84(2).  Nothing in the statutory language detailing the procedures by which absentee ballots may be cast mentions drop boxes or anything like them.

### 2.  Ballot Drop Boxes Are Unauthorized by Law

¶55 Wisconsin Stat. § 6.87(4)(b)1. provides, in relevant part, that absentee ballots "shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots."  The prepositional phrase "to the municipal clerk" is key and must be given effect.  Wisconsin Stat. § 5.02(10) defines "municipal clerk" as "the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives.  Where applicable, 'municipal clerk' also includes the clerk of a school district."  An inanimate object, such as a ballot drop box, cannot be the municipal clerk.  At a minimum, accordingly, dropping a ballot into an unattended drop box is not delivery "to the municipal clerk[.]"

34

¶56 Wisconsin Stat. § 6.855 further shows the unlawfulness of ballot drop boxes. Subsection (1) of that statute states:

> The governing body of a municipality may elect to designate a site other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election. The designated site shall be located as near as practicable to the office of the municipal clerk or board of election commissioners and no site may be designated that affords an advantage to any political party. An election by a governing body to designate an alternate site under this section shall be made no fewer than 14 days prior to the time that absentee ballots are available for the primary under s. 7.15 (1) (cm), if a primary is scheduled to be held, or at least 14 days prior to the time that absentee ballots are available for the election under s. 7.15 (1) (cm), if a primary is not scheduled to be held, and shall remain in effect until at least the day after the election. If the governing body of a municipality makes an election under this section, no function related to voting and return of absentee ballots that is to be conducted at the alternate site may be conducted in the office of the municipal clerk or board of election commissioners.

Subsection (3) declares an alternate absentee ballot site must be "staffed by the municipal clerk or the executive director of the board of election commissioners, or employees of the clerk or the board of election commissioners." Subsection (5) allows the establishment of multiple alternate sites.

¶57 Ballot drop boxes are not alternate absentee ballot sites under Wis. Stat. § 6.855 because a voter can only return the voter's absentee ballot to a drop box, while an alternate site must also allow voters to request and vote absentee at the site. If a drop box were an alternate ballot site, by the plain

35

language of the statute, "no function related to voting and return of absentee ballots that is to be conducted at the alternate site may be conducted in the office of the municipal clerk or board of election commissioners." § 6.855(1). The defendants do not advance this construction of the statutes.

¶58 If ballot drop boxes are not alternate absentee ballot sites, "what [are] they?" Trump v. Biden, 2020 WI 91, ¶101, 394 Wis. 2d 629, 951 N.W.2d 568 (Roggensack, C.J., dissenting). Existing outside the statutory parameters for voting, drop boxes are a novel creation of executive branch officials, not the legislature. The legislature enacted a detailed statutory construct for alternate sites. In contrast, the details of the drop box scheme are found nowhere in the statutes, but only in memos prepared by WEC staff, who did not cite any statutes whatsoever to support their invention.

¶59 Wisconsin Stat. § 6.855 identifies the sites at which in person absentee voting may be accomplished——either "the office of the municipal clerk" or "an alternate site" but not both. "An alternate site" serves as a replacement for "the office of the municipal clerk" rather than an additional site for absentee voting. Wisconsin Stat. § 6.87(4)(b)1. requires the elector to mail the absentee ballot or deliver it in person, "to the municipal clerk," which is defined to include "authorized representatives." This subparagraph contemplates only two ways to vote absentee: by mail and at "the office of the municipal clerk" or "an alternate site" as statutorily described. No third option exists.

36

¶60 Other election statutes are similarly silent on any other method of voting absentee other than by mail or at the office of the municipal clerk. Wisconsin Stat. § 5.81(3) provides, in relevant part: "If a municipality utilizes an electronic voting system in which ballots distributed to electors are employed, absentee ballots may consist of ballots utilized with the system or paper ballots and envelopes voted in person in the office of the municipal clerk or voted by mail." The statute states, "absentee ballots may consist of" and then describes ballots cast "in person in the office of the municipal clerk" and ballots "voted by mail." § 5.81(3). The legislature did not contemplate absentee ballots "consist[ing]" of ballots cast via a drop box.

¶61 In Wis. Stat. § 6.87(4)(b)1. the prepositional phrase, "to the municipal clerk," modifies both the clause "mailed by the elector," i.e., absentee ballots "shall be mailed by the elector . . . to the municipal clerk" as well as "delivered in person." The defendants contend "to the municipal clerk" encompasses unstaffed drop boxes maintained by the municipal clerk. A hyper-literal interpretation of this prepositional phrase, taken out of context, would permit voters to mail or personally deliver absentee ballots to the personal residence of the municipal clerk or even hand the municipal clerk absentee ballots at the grocery store. "Municipal clerk," however, denotes a public office, held by a public official acting in an official capacity when performing statutory duties such as accepting ballots. The statutes do not authorize the municipal

37

clerk to perform any official duties related to the acceptance of ballots at any location beyond those statutorily prescribed.

¶62 The fairest interpretation of the phrase "to the municipal clerk" means mailing or delivering the absentee ballot to the municipal clerk at her office or, if designated under Wis. Stat. § 6.855, an alternate site. "Properly applied, the plain-meaning approach is not 'literalistic'; rather, the ascertainment of meaning involves a 'process of analysis' focused on deriving the fair meaning of the text itself." Brey, 400 Wis. 2d 417, ¶11 (quoting Kalal, 271 Wis. 2d 633, ¶¶46, 52). Adopting a literalistic interpretation instead of applying the fair meaning of "to the municipal clerk" would similarly subject any "authorized representative" of the municipal clerk to the same intrusions of accepting ballots wherever a voter may find the municipal clerk's representative. Wis. Stat. § 5.02(10). Interpreting Wis. Stat. § 6.87(4)(b)1. to permit such methods of casting an absentee ballot would contravene the legislative policy expressed in Wis. Stat. § 6.84(1) and border on the absurd. See Scalia & Garner, Reading Law, at 217 ("A preamble, purpose clause, or recital is a permissible indicator of meaning.").

¶63 Notwithstanding the detailed and unambiguous language of Wis. Stat. §§ 6.84 and 6.855, WEC asks this court to conclude the legislature "hid[] [an] elephant[] in [a] mousehole[.]" See Whitman v. Amer. Trucking Ass'n, 531 U.S. 457, 468 (2001) (citations omitted). Coined by Justice Antonin Scalia, this turn of phrase means the legislature "does not alter the

38

fundamental details of a regulatory scheme in vague terms or ancillary provisions[.]" Id.; see also Palm, 391 Wis. 2d 497, ¶¶53-56. WEC would have us believe, hiding within four words, "to the municipal clerk," is an expansive conception of voting methods never before recognized. We decline to read into the statutes a monumentally different voting mechanism not specified by the legislature. See E.P.A. v. EME Homer City Generation, L.P., 572 U.S. 489, 528 (2014) (Scalia, J., dissenting) ("It would be extraordinary for Congress, by use of the single word 'significantly,' to transmogrify a statute that assigns responsibility on the basis of amounts of pollutants emitted into a statute authorizing EPA to reduce interstate pollution in the manner that it believes most efficient.").

¶64 WEC and DRW argue the drop box "elephant" is, in fact, no elephant at all. WEC claims "the Commission did not create [ballot] drop boxes. The March 2020 memorandum provided guidance in response to clerks' inquiries about their use, and there is testamentary evidence that drop boxes were used in Wisconsin before the August 2020 memorandum." Of course "there is . . . evidence" drop boxes were used before the issuance of Memo two because WEC issued Memo one in March, which comes before August.

¶65 The record evidence WEC cited does not support its argument that ballot drop boxes have been in common and longstanding use in this state. First, WEC cites Memo one, which says, "clerks have inquired about options for ensuring that the maximum number of ballots are returned to be counted

39

for the April 7, 2020 election." This statement suggests a state of uncertainty surrounding the legality of drop boxes, rather than documenting their ostensibly extensive use.

¶66 Second, WEC cites a third memo prepared by WEC's staff, responding to a recent study by the Legislative Audit Bureau (LAB), a non-partisan institution. In this report, LAB concluded WEC had overstepped its lawful authority by authorizing ballot drop boxes.[26] Citing no evidence, this third memo proclaims "[t]he use of ballot drop boxes at the local level in Wisconsin, and elsewhere in the country, predates the Wisconsin Election Commission's . . . August 19, 2020, memorandum on the topic[.]" For support, WEC noted, "no Wisconsin court has foreclosed the idea of lawfully using absentee ballot drop boxes," expressly referencing this very case and adding, "[t]he case is ongoing and no resolution has been reached at this time." For this third memo to be given any weight would require us to hold a government agency can be sued and then issue what amounts to a press release that it can cite as support for its interpretation of law.

---

[26] Legislative Audit Bureau, Elections Administration (2021), https://legis.wisconsin.gov/lab/media/3288/21-19full.pdf; see also Off. of the Special Couns., Second Interim Investigative Report on the Apparatus & Procedures of the Wisconsin Elections System 78 (Mar. 1, 2022), https://legis.wisconsin.gov/assembly/22/brandtjen/media/1552/osc-second-interim-report.pdf ("In Wisconsin, election officials' unprecedented use of absentee ballot drop boxes facially violated Wisconsin law.").

40

¶67 Third, WEC cites its own website, which has a page that is not significantly different than the third memo. The page bears the heading "[w]hy did WEC allow clerks to use drop boxes for absentee ballots?" WEC offers the following conclusory statement: "some clerks have used them prior to 2020" but supplies no evidence.

¶68 Lastly, WEC (along with DRW) cites an affidavit from Administrator Wolfe as evidence of the supposedly "extensive history" of ballot drop boxes in Wisconsin. The affidavit merely says, "[t]he use of absentee ballot drop boxes in the United States predates the [COVID-19] pandemic." Again, Administrator Wolfe offers no evidence to support this statement. Even if the assertions regarding the historical use of ballot boxes were true, they are irrelevant. Longstanding noncompliance with the law does not cure its illegality.

¶69 Perhaps realizing "delivery in person[] to the municipal clerk" does not mean nor has it been historically understood to mean delivery to an unattended ballot drop box, the defendants analogize these boxes to a mailbox. Of course, the law expressly allows a voter to place an absentee ballot in a mailbox. Wis. Stat. § 6.87(4)(b)1. ("shall be mailed by the elector . . . ."). Ballot drop boxes, however, are not mailboxes.

¶70 The ordinary meaning of "mailed by the elector" in Wis. Stat. § 6.87(4)(b)1. contemplates involvement by a third-party mail carrier. The very next sentence of the statute declares, "[i]f the envelope is mailed from a location outside

41

the United States, the elector shall affix sufficient postage unless the ballot qualifies for delivery free of postage under federal law." § 6.87(4)(b)1. To affix postage to an absentee ballot placed in a ballot drop box would be a waste of a perfectly good stamp. Similarly, § 6.87(3)(a) directs, in relevant part, "the municipal clerk shall mail the absentee ballot to the elector's residence . . . . If the ballot is mailed, and the ballot qualifies for mailing free of postage under federal free postage laws, the clerk shall affix the appropriate legend required by U.S. postal regulation. Otherwise, the clerk shall pay the postage required[.]" In common parlance, "mail" may encompass delivery services by private businesses such as FedEx or UPS, in addition to the United States Postal Service.[27]

¶71 If there were any lingering doubt about the difference between drop boxes and mailing, drop boxes trigger the very concerns the legislature expressly seeks to avoid. "[V]oting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place. The legislature finds that the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse[.]" Wis. Stat. § 6.84(1). As the Wisconsin voters argue, "a drop box contains only ballots, and lots of them in one place

---

[27] The plain meaning of "mail" supports this conclusion. See Mail, The American Heritage Dictionary of the English Language 1083 (3d ed. 1992) ("To send by mail;" "Materials, such as letters and packages, handled in a postal system.").

at the same time, making it a prime target for would-be tamperers, whereas mailboxes may or may not contain ballots at any given time." While the legislature has recognized absentee voting has many benefits for voters, the legislature has also enacted safeguards designed to minimize the possibility of fraud. "Voting fraud is a serious problem in U.S. elections[,] . . . and it is facilitated by absentee voting. In this respect absentee voting is to voting in person as a take-home exam is to a proctored one." Griffin v. Roupas, 385 F.3d 1128, 1130-31 (7th Cir. 2004) (internal citations omitted).

¶72 We conclude WEC's staff erred by authorizing a voting mechanism not authorized by law. The memos created a ballot drop box scheme entirely absent from Wisconsin's election code. The legislature's "carefully regulated" procedures for absentee voting do not permit voting via ballot drop boxes.

### 3. "[I]n Person" Absentee Voting Requires the Voter to Personally Deliver the Ballot to the Municipal Clerk

¶73 WEC's staff also erred in Memo one by stating "[a] family member or another person may . . . return the ballot on behalf of the voter," i.e., an agent of the voter may place the voter's absentee ballot in a drop box. The law does not permit this. Wisconsin Stat. § 6.87(4)(b)1. states, in relevant part, "[t]he envelope shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." (Emphasis added.) The key phrase is "in person" and it must be assigned its natural meaning.

43

¶74 "[I]n person" denotes "bodily presence" and the concept of doing something personally. in person, The Oxford English Dictionary 598 (2d. ed. 1989) (defining "in person" as "with or by one's own action or bodily presence; personally; oneself"); Person, Webster's Third New International Dictionary 1686 (2002) ("bodily presence —— usu. used in the phrase in person"); in person, The Random House Dictionary of the English Language 1445 (2d ed. 1987) ("in one's own bodily presence; personally; Applicants are requested to apply in person.").

¶75 As used throughout Wisconsin's election code, the phrase "in person" refers to a voter acting directly, not through an agent. See 5 Wis. Att'y Gen. 591, 592 (1916) ("The statute says: 'Application for such ballot shall be made in person.' (Sec. 11.56.) The ordinary meaning of the phrase 'in person' is that the request must come directly from the elector who was corporally present before the clerk."). For example, Wis. Stat. § 6.86(1)(a) states, in relevant part:

> (a) Any elector of a municipality who is registered to vote whenever required and who qualifies under ss. 6.20 and 6.85 as an absent elector may make written application to the municipal clerk of that municipality for an official ballot by one of the following methods:
>
> 1. By mail.
>
> 2. In person at the office of the municipal clerk or at an alternate site under s. 6.855, if applicable.
>
>     . . . .
>
> 4. By agent as provided in sub. (3).

44

(Emphasis added.) Section 6.86(1)(a) unequivocally distinguishes between "in person" and "by agent." Subsection (3) then begins by stating, "[a]ny elector who is registered and who is hospitalized, may apply for and obtain an official ballot by agent." § 6.86(3)(a)1. (Emphasis added.) It then describes the process of receiving a ballot by agent. The legislature obviously knows how to authorize a voter to act through an agent; it used such language in § 6.86 but not Wis. Stat. § 6.87. See Yakich, 400 Wis. 2d 549, ¶24 (quoting Milwaukee J. Sentinel, 341 Wis. 2d 607, ¶¶36-37).

¶76 Other election statutes also explicitly describe an agency relationship. For example, the phrase "municipal clerk" includes "authorized representatives." Wis. Stat. § 5.02(10) ("'Municipal clerk' means the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives. Where applicable, 'municipal clerk' also includes the clerk of a school district."); see also § 5.02(2) ("'County clerk' includes the executive director of the county board of election commissioners and their authorized representatives.").

¶77 Unlike "municipal clerk," the definition of "elector" does not encompass an agency relationship. Wis. Stat. § 6.02(1) ("Every U.S. citizen age 18 or older who has resided in an election district or ward for 28 consecutive days before any election where the citizen offers to vote is an eligible elector."); see also Wis. Stat. § 6.85(1) ("An absent elector is any otherwise qualified elector who for any reason is unable or

45

unwilling to appear at the polling place in his or her ward or election district."); Wis. Stat. § 5.02(12n) ("'Overseas elector' means a U.S. citizen who is residing outside of the United States, who is not disqualified from voting under s. 6.03, who has attained or will attain the age of 18 by the date of an election at which the citizen proposes to vote, who was last domiciled in this state or whose parent was last domiciled in this state immediately prior to the parent's departure from the United States, and who is not registered to vote or voting in any other state, territory, or possession.").

¶78 WEC does not address this dispositive statutory distinction between "in person" and "by agent," instead primarily emphasizing the presence of the passive voice in Wis. Stat. § 6.87(4)(b)1.: "The envelope shall be . . . delivered in person[.]" In support of its argument, WEC quotes a Seventh Circuit decision as stating: "a legislature's use of the passive voice sometimes reflects indifference to the actor." Rubin v. Islamic Republic of Iran, 830 F.3d 470, 479 (7th Cir. 2016), aff'd, 138 S. Ct. 816 (2018). The paragraph from which WEC selectively seized that sentence defeats WEC's position:

> It's true that a legislature's use of the passive voice sometimes reflects indifference to the actor. See Dean v. United States, 556 U.S. 568, 572, 129 S.Ct. 1849, 173 L.Ed.2d 785 (2009) ("The passive voice focuses on an event that occurs without respect to a specific actor. . . ."). But attributing indifference to Congress in this instance would be inconsistent with the FSIA's statutory declaration of purpose, which explicitly invokes the international law understanding of foreign sovereign immunity: "Under international law, states are not immune from the

46

jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." 28 U.S.C. § 1602[.]

Id. (emphasis added). Rubin suggests the statement of legislative policy in Wis. Stat. § 6.84 is a better indicator of statutory meaning than the passive voice used in § 6.87(4)(b)1.

¶79 A case cited by DRW is likewise unpersuasive because it pre-dates Wis. Stat. § 6.84. In Sommerfeld v. Board of Canvassers of the City of St. Francis, 18 absentee "voters did not return . . . absentee ballots in the envelopes by mail, or deliver[] the same in person, as provided by [a predecessor statute], but caused the same to be returned to the Clerk of the City of St. Francis by a third person, who returned the sealed envelopes to the said Clerk." 269 Wis. 299, 301, 69 N.W.2d 235 (1955). A majority of this court concluded:

> If our statute is construed to mean that the voter shall himself mail the ballot or personally deliver it to the clerk, then the statute would defeat itself in the case of those who are sick or physically disabled. They would be unable to mail ballots except through an agent. Having made provision that these unfortunate people can vote, we cannot believe that the legislature meant to disenfranchise them by providing a condition that they could not possibly perform.

Id. at 303. To the extent Sommerfeld has any relevance, it too undercuts the defendants' arguments.

¶80 First, the legislature superseded Sommerfeld's conclusion in 1986 by adopting Wis. Stat. § 6.84. 1985 Wis. Act 304, § 68n. Section 6.84(2) provides that "with respect to matters relating to the absentee ballot process," several

47

statutes, including § 6.87(4), "shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election." The adoption of § 6.84 renders Sommerfeld a nullity. The majority in that case relied on a different statutory provision: "Section 5.011 provides that Title II shall be construed so as to give effect to the will of the electors, if that can be ascertained, notwithstanding informality or failure to comply with some of its provisions."[28] Sommerfeld, 269 Wis. at 302.

¶81 The Sommerfeld majority deemed the in person delivery requirement "directory only," so it reasoned "a delivery of ballots by agent is a substantial compliance" permitting the counting of the ballots. Id. at 304. In election law, "[t]he difference between mandatory and directory provisions of election statutes lies in the consequence of nonobservance: an act done in violation of a mandatory provision is void, whereas an act done in violation of a directory provision, while improper, may nevertheless be valid." Id. at 303 (quoting 29 C.J.S. § 214). Much of the majority opinion in Sommerfeld is spent explaining why the majority deemed the relevant statute merely directory and describing the "complaint" as "purely

---

[28] See Wis. Stat. § 5.01(1) ("Except as otherwise provided, chs. 5 to 12 shall be construed to give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to fully comply with some of their provisions.").

48

technical." Id. at 304. This entire discussion of how to classify a statute——mandatory or directory——seemed to rest on the assumption that the statute was not followed; if the statute were followed, the majority would not have needed to declare the law merely directory.

¶82 Three justices dissented, offering a statutory interpretation consistent with our reading of Wis. Stat. § 6.87(4)(b)1. The dissent defined "in person" as "[b]y one's self; with bodily presence." Id. at 304 (Gehl, J., dissenting) (quoting in person, Webster's New International Dictionary (2d ed. 1934)). It then noted, "[h]ad the legislature intended that the ballot might be delivered by a representative, it might easily have so declared." Id. "Nothing is found in the statutes concerning absentee voting that indicates legislative disposition to permit the absentee ballot to be delivered by agent." Id. at 305.

¶83 Reading the election statutes in context and as a whole, we conclude an absentee ballot delivered in person under Wis. Stat. § 6.87(4)(b)1. must be delivered personally by the voter. Unlike Wis. Stat. § 6.86, which allows the receipt of an absentee ballot through an agent under particular circumstances and subject to detailed procedures, no similar language authorizes voters not meeting the exceptions outlined under § 6.86 to cast a ballot through delivery by an agent.

IV. FEDERAL PREEMPTION

¶84 DRW argues federal law preempts the circuit court's interpretation of Wisconsin statutes. It cites 52

49

U.S.C. § 10508 (2018), which provides, "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice[.]" DRW claims "[t]he assistance addressed [in this statute] . . . extends to returning that ballot so it may be counted." DRW's discussion of § 10508 is limited to one paragraph in its opening brief. It cites nothing more than a single source of legislative history for support. DRW selectively quotes from this report, omitting the first sentence of the paragraph on which it relies, which states: "STATE PROVISIONS WOULD BE PREEMPTED ONLY TO THE EXTENT THAT THEY UNDULY BURDEN THE RIGHT RECOGNIZED IN THIS SECTION, WITH THAT DETERMINATION BEING A PRACTICAL ONE DEPENDENT UPON THE FACTS." See S. Rep. No. 97-417 (1982), 97th Cong., 2d Sess. at 63. Additionally, DRW does not address Wis. Stat. § 6.87(5), which states:

> If the absent elector declares that he or she is unable to read, has difficulty in reading, writing or understanding English or due to disability is unable to mark his or her ballot, the elector may select any individual, except the elector's employer or an agent of that employer or an officer or agent of a labor organization which represents the elector, to assist in marking the ballot, and the assistant shall then sign his or her name to a certification on the back of the ballot, as provided under s. 5.55.

The language of this subsection is similar to § 10508.

¶85 DRW also cites the Americans with Disabilities Act (ADA), but, similarly, its discussion of the ADA is limited to a single paragraph in its opening brief. DRW does not cite any

binding cases supporting its preemption argument, nor does DRW discuss preemption in its reply brief, even though the Wisconsin voters complained the argument was underdeveloped.

¶86 As far as we can discern, DRW's argument largely rests on the practical impact of the circuit court's declarations on disabled voters who may be physically unable to vote if someone cannot place an absentee ballot in the mail on a voter's behalf. We agree with the Wisconsin voters that DRW's argument is underdeveloped. See State v. Gracia, 2013 WI 15, ¶28 n.13, 345 Wis. 2d 488, 826 N.W.2d 87 (explaining we do not have to address underdeveloped arguments (cited source omitted)); see also In re Disciplinary Proc. Against Johns, 2014 WI 32, ¶45, 353 Wis. 2d 746, 847 N.W.2d 179 (per curiam) ("The OLR ignores the topic in its reply brief. . . . We take this lack of reply by the OLR as a concession[.]" (cited source omitted)). Because "[p]reemption . . . is disfavored 'in the absence of persuasive reasons,'" the shallowness of the argument undermines it. See Town of Delafield, 392 Wis. 2d 427, ¶6 (quoting Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317 (1981)). Whatever accommodations federal law requires, Wis. Stat. § 6.87(5) seems to permit them. See also Wis. Stat. § 6.87(4)(b)1. ("The elector may receive assistance under sub. (5)."). We address the argument no further.

V. CONCLUSION[29]

¶87 Only the legislature may permit absentee voting via ballot drop boxes. WEC cannot. Ballot drop boxes appear nowhere in the detailed statutory system for absentee voting. WEC's authorization of ballot drop boxes was unlawful, and we therefore affirm the circuit court's declarations and permanent injunction of WEC's erroneous interpretations of law except to the extent its remedies required absentee voters to personally mail their ballots, an issue we do not decide at this time, and we decline to decide at this time whether the memos are also invalid as unpromulgated administrative rules.

*By the Court.*——The judgment and order of the Circuit Court are affirmed.

---

[29] "Finally, and most importantly, the dissent's resort to [ad hominem attacks on the majority] is a poor substitute for legal argument. Such personal aspersions have no place in a judicial opinion. . . . [It] do[es] real damage to the public's perception of this court's work. We must aspire to be better models of respectful dialogue to preserve the public's confidence on which this court's legitimacy relies." Becker v. Dane County, 2022 WI __, ¶44, __ Wis. 2d __, __ N.W.2d __ (Karofsky, J.). Although Justice Jill J. Karofsky recently complained about the tone of a dissent she deemed too harsh (joined by Justice Hagedorn, who does not join this footnote), she nevertheless joins a dissent that accuses her colleagues of "blithely and erroneously seek[ing] to sow distrust in the administration of our elections and through its faulty analysis erect[ing] yet another barrier for voters[.]" Dissent, ¶205. The dissent continues, "[s]uch a result, although lamentable, is not a surprise from this court. It has seemingly taken the opportunity to make it harder to vote or to inject confusion into the process whenever it has been presented with the opportunity. . . . [W]ithout justification [the majority] fans the flames of electoral doubt that threaten our democracy." Id., ¶¶206, 208. Political talking points are no substitute for legal analysis.

52

¶88 PATIENCE DRAKE ROGGENSACK, J. *(concurring).* The majority opinion concludes that the Wisconsin Elections Commission's (WEC) documents (hereinafter memos) are invalid because ballot drop boxes are not legal in Wisconsin and because absentee ballots must be personally delivered by the voter to the municipal clerk at the clerk's office. I agree, and join the majority opinion. I write further to explain that, under Wisconsin statutes, it is the elector who shall mail the absentee ballot to the municipal clerk. Accordingly, I respectfully concur.

## I. BACKGROUND[1]

¶89 During the COVID-19 pandemic, citizens of Wisconsin were advised to avoid large crowds and to socially distance from each other. This advice changed the way that many citizens participated in personal tasks. For example, during the 2020 Spring election, many voters opted to vote absentee and absentee voting increased.

¶90 The WEC issued multiple memos, which were directed at municipal clerks and election officials. Relevant to our discussion, the first memo stated, among other things, that "[a] family member or another person may . . . return the ballot on behalf of a voter." The "return" that was described referred to returns to drop boxes. Both memos focused on drop boxes, describing their appearance, their locations and that they may be used by voters "without having to mail [ballots] back." Drop

---

[1] The majority opinion capably sets out the background underlying this controversy. Therefore, I describe here only that which is necessary to understand my writing below.

1

boxes were suggested as an alternative to mailing ballots for "voters [] motivated by lack of trust in the postal process, fear that their ballot could be tampered with, or concern that their information will be exposed. Voters may also be concerned about ensuring that their ballot is returned in time to be counted."[2]

¶91 Based on the WEC memos, Richard Teigen and Richard Thom (collectively Teigen), filed suit seeking, in part, declaratory judgment under Wis. Stat. § 806.04, which provides that any person "whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder." § 806.04(2). Teigen asserted that the WEC's memos violated the provisions of Wis. Stat. § 6.87(4)(b)1. and Wis. Stat. § 6.855(1); that his voting rights were affected by these statutes; and Teigen sought to have a court declare the correct construction of § 6.87(4)(b)1.

¶92 After intervention by the Democratic Senatorial Campaign Committee (DSCC), as well as Disability Rights Wisconsin, Wisconsin Faith Voices for Justice, and the League of Women Voters of Wisconsin (collectively DRW), Teigen moved for summary judgment, setting out what Teigen alleged was the proper construction of Wis. Stat. § 6.87(4)(b)1. The circuit court held a hearing in which it orally granted Teigen's motion in

---

[2] WEC memo August 19, 2020.

2

full. The court explained that, unlike voting in person, voting by absentee ballot is "a privilege exercised wholly outside the traditional safeguards of the polling place." It further concluded that the legislature required that absentee voting must be carefully regulated to "prevent the potential for fraud or abuse, to prevent overzealous solicitation of absent electors who may prefer not to participate in an election, to prevent undue influence on the absent elector to vote for or against a candidate, or to cast a particular vote in a referendum or other similar abuses."

¶93 In regard to whom may return an absentee ballot, the circuit court explained that "[it did not] see any language in the statute that provides a basis for having agents, somebody other than the elector, actually deliver the ballot." Further, in quoting the portion of the memo that purported to allow family members or other persons to return a ballot on behalf of the voter, the court concluded that it did not "see anything in the statute that says that. In reading the statute, the statute is clear. It's not ambiguous. It's not necessary to go to outside sources to determine how . . . return of the ballot is addressed." In its judgment, the court was satisfied that the "portions of the [memo] that address that other people may bring the ballot in, it doesn't have to be the elector, are contrary to the statute."

¶94 The court declared that the WEC's memos were inconsistent with state statutes and specifically concluded that an elector must personally mail or deliver his or her own

3

absentee ballot, except when otherwise specifically authorized by law. The defendants appealed this ruling to the court of appeals. Teigen filed a petition to bypass the court of appeals, which we granted.

## II. DISCUSSION

### A. Standard of Review

¶95 I review Teigen's claim for declaratory relief under Wis. Stat. § 806.04 and I apply Wis. Stat. § 6.87(4)(b)1. in regard to mailing absentee ballots. Therefore, I interpret the statutes at issue. We interpret and apply statutes as questions of law subject to our independent determination, while benefitting from the decision of the circuit court. Townsend v. ChartSwap, LLC, 2021 WI 86, ¶11, 399 Wis. 2d 599, 967 N.W.2d 21.

### B. Statutory Interpretation

¶96 "[T]he purpose of statutory interpretation is to determine what the statute means . . . ." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Judicial deference to the policy choices enacted into law by the legislature requires that statutory interpretation focus primarily on the language of the statute. We assume that the legislature's intent is expressed in the statutory language. Id. Therefore, statutory interpretation begins with the words that the legislature chose. If the meanings of the words are plain and unambiguous, the court's inquiry ends and there is no need to consult extrinsic sources of interpretation, such as legislative history. Id., ¶¶45, 46.

4

¶97 In addition to examining the plain words of the text, context is part of a plain meaning interpretation. "So, too, is the structure of the statute in which the operative language appears." Id., ¶46. Therefore, rather than in isolation, "statutory language is interpreted in the context in which it is used; . . . in relation to the language of surrounding or closely-related statutes; . . . to avoid absurd or unreasonable results; [and] read, where possible to give effect to every word, in order to avoid surplusage." Id.

¶98 It is consistent with the plain-meaning rule "to consider the intrinsic context in which statutory language is used; a plain-meaning interpretation cannot contravene a textually or contextually manifest statutory purpose." Id., ¶49. However, in "construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of [a] statute." Id., ¶46. Nor are courts permitted to read words into a statute that the legislature did not insert itself. Dawson v. Town of Jackson, 2011 WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316.

1. Uniform Declaratory Judgment Act

¶99 The Uniform Declaratory Judgment Act is contained in Wis. Stat. § 806.04, which provides:

> (1) Scope. Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed . . . . The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree, except that finality for purposes of filing an appeal as of

5

right shall be determined in accordance with s. 808.03(1).

(2) Power to construe, etc. Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

¶100 In order to obtain declaratory judgment, there must be a justiciable controversy. See Loy v. Bunderson, 107 Wis. 2d 400, 410, 320 N.W.2d 175 (1982). A controversy is justiciable when the following factors are present:

(1) A controversy in which a claim of right is asserted against one who has an interest in contesting it.

(2) The controversy must be between persons whose interests are adverse.

(3) The party seeking declaratory relief must have a legal interest in the controversy——that is to say, a legally protectible interest.

(4) The issue involved in the controversy must be ripe for judicial determination.

Putnam v. Time Warner Cable of Se. Wis., Ltd. P'ship, 2002 WI 108, ¶41, 255 Wis. 2d 447, 649 N.W.2d 626 (citing Loy, 107 Wis. 2d at 410). If all four factors are met, the controversy is justiciable and a court may entertain an action for declaratory judgment. Miller Brands-Milwaukee, Inc. v. Case, 162 Wis. 2d 684, 694, 470 N.W.2d 290 (1991).

¶101 Here, I conclude that all four factors are met. First, Teigen's suit is a controversy that opposes the WEC's

6

memos and intervenors' positions, each of whom have an interest in contesting Teigen's position. Second, Teigen and the WEC have adverse interests regarding the legality of the current memos and the WEC's authority to continue issuing similar memos in the future. Third, as the majority concludes, Teigen has a legally protectable interest in making sure that his vote is not "pollute[d]" and that proper election procedures are followed.[3] And finally, Teigen's suit against the WEC is ripe for judicial determination. The circuit court decided that the elector was required to personally mail his or her own completed ballot to the clerk's office.[4] Affirming the circuit court's decision is expressed in several briefs, as is the need for uniform guidance.[5] The WEC has issued memos that encourage drop boxes over mail-in ballot returns, and municipal clerks and election officials have acted on those memos. Teigen is a Wisconsin voter who is affected by the WEC's memos. Because the controversy is justiciable, I proceed to the merits of Teigen's statutory interpretation claim with regard to mailing absentee ballots, and conclude that the memos encourage drop boxes over mailing completed ballots and are inconsistent with Wis. Stat. § 6.87(4)(b)1. Therefore, they are contrary to law.

2. Wisconsin Stat. § 6.87(4)(b)1.

---

[3] Majority op., ¶25.

[4] Teigen v. Wis. Elections Comm'n, No. 2022AP91, Order at 2 (Jan. 20. 2022).

[5] See e.g., Briefs: League of Wis. Municipalities, Republican National Committee and Honest Elections Project.

7

¶102 As a foundational matter, we construe closely related statutes in the context in which the legislature placed them. City of Janesville v. CC Midwest, Inc., 2007 WI 93, ¶24, 302 Wis. 2d 599, 734 N.W.2d 428. "[W]e examine the language of surrounding or closely related statutes in order to interpret a statute in the context in which it is used." Id. Accordingly, we do not interpret Wis. Stat. § 6.87(4)(b)1. in isolation. Rather, we interpret it with the assistance of closely related statutes.

¶103 As we begin, it is important to note that the legislature has supplied the lens through which absentee voting statutes are to be viewed. Wisconsin Stat. § 6.84 provides:

> [V]oting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place. The legislature finds that the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse; to prevent overzealous solicitation of absent electors who may prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses.

§ 6.84. Furthermore, regarding interpretation of the absentee voting statutes, the legislature has mandated that:

> [W]ith respect to matters relating to the absentee ballot process, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)2. and 4. shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election.

§ 6.84(2).

8

¶104 We have construed statutes relating to voting procedures and have strictly enforced them. In State ex. rel. Stearns, we concluded that the Secretary of State correctly prohibited a candidate who turned in his nomination papers two minutes after the statutory deadline from appearing on the ballot. State ex. rel. Stearns v. Zimmerman, 257 Wis. 443, 444-46, 43 N.W.2d 681 (1950). We reasoned that, by setting the 5 p.m. deadline within the statute, "no fact or situation appear[ed] except those contemplated and provided for by the legislature." Id. at 446. However, if we had decided to enlarge the time which the legislature has designated for the filing of nomination papers, we would be "amend[ing] the statute, not [construing] it." Id.

¶105 Again, in State ex. rel. Ahlgrimm, we concluded that a candidate who filed his nomination papers in the wrong office was barred from appearing on the ballot by the terms of the statute. State ex rel. Ahlgrimm v. State Elections Bd., 82 Wis. 2d 585, 595-96, 263 N.W.2d 152 (1978). The candidate argued that, because the statute that outlined the place of filing nomination papers did not specify that noncompliance was fatal, we should have concluded that its prescriptions were directory rather than mandatory. Id. at 593. We concluded that this argument was "without merit" and, as with the time for filing, the statute's instruction governing the place of filing nomination papers was mandatory. Id. at 595.

¶106 Turning to the statute at issue, Wis. Stat. § 6.87(4)(b)1., it determines required procedures for absentee

9

voting when specially identified circumstances do not exist.[6] Section 6.87(4)(b)1. provides in regard to mailing that absentee ballots "shall be mailed by the elector . . . to the municipal clerk." Electors are statutorily defined as "[e]very U.S. citizen age 18 or older who has resided in an election district or ward for 28 consecutive days before any election where the citizen offers to vote[.]" Wis. Stat. § 6.02. Accordingly, when § 6.87(4)(b)1. says "the elector[,]" it means, the voter.

¶107 The plain statutory text, provides that if a ballot is returned by mail, it is the "elector" who does the mailing. Wisconsin Stat. § 6.87(4)(b)(1). requires that absentee ballots "<u>shall</u> be mailed by the elector . . . to the municipal clerk." The legislature could have said "<u>may</u> be mailed by the elector" if it were not mandatory that the elector do the mailing. As the circuit court correctly concluded, "the statute is clear. It's not ambiguous. It's not necessary to go to outside sources to determine how . . . return of the ballot is addressed." Indeed, DRW concedes this point in its briefing.

¶108 DRW argues that, in spite of the unambiguous text, the statutes allow an agent of an elector to mail the absentee ballot on an elector's behalf. This argument is based on a 1955 case, <u>Sommerfeld v. Bd. of Canvassers of the City of St. Francis</u>. In <u>Sommerfeld</u>, we concluded that "in order to fulfill the spirit of our election laws the last sentence of section 11.59 [which required delivery by the elector] is directory only, and that a delivery of ballots by agent is a substantial

_____

[6] <u>See</u> ¶¶109-111 below.

10

compliance therewith." Sommerfeld v. Bd. of Canvassers of the City of St. Francis, 269 Wis. 299, 304, 69 N.W.2d 235 (1955). However, as the majority points out, Sommerfeld pre-dates Wis. Stat. § 6.84.[7] Its conclusion, that absentee voting procedures were directory, contradicts § 6.84, which requires that absentee voting procedures are "mandatory[,]" i.e., they must be followed. Accordingly, to the extent that it described voting procedures as directory and substantial compliance being sufficient to satisfy § 6.84, Sommerfeld is no longer good law.[8]

¶109 Without Sommerfeld, DRW's argument falls apart. The statutory definition of "elector" does not include agents; rather, it defines a person who is eligible to vote. Wis. Stat. § 6.02. Wisconsin Stat. § 6.87(4)(b)1. requires that absentee ballots be mailed by the elector; who, as I note, is statutorily defined in § 6.02(1). In accord with the circuit court, I conclude that the plain meaning of text is clear and unambiguous; § 6.87(4)(b)1. does not permit an agent to mail an absentee ballot for a voter.

¶110 That agents are not permitted by the terms of Wis. Stat. § 6.87(4)(b)1. to mail absentee ballots is further supported by comparing the language in § 6.87(4)(b)1. with other statutes in which the legislature has explicitly allowed an agent or non-elector to participate in the absentee voting process. Those statutes, in keeping with the policy in Wis.

---

[7] Majority op., ¶80.

[8] Id.

11

Stat. § 6.84(1), have formalistic, regulated conditions attached.

¶111 For example, when a voter is a member of a sequestered jury, the legislature has provided very detailed instructions about voting and returning the ballot where a non-voter participates. Wisconsin Stat. § 6.86(1)(b) provides in relevant part:

> If the application indicates that the reason for requesting an absentee ballot is that the elector is a sequestered juror, the application shall be received no later than 5 p.m. on election day. If the application is received after 5 p.m. on the Friday immediately preceding the election, the municipal clerk or the clerk's agent shall immediately take the ballot to the court in which the elector is serving as a juror and deposit it with the judge. The judge shall recess court, as soon as convenient, and give the elector the ballot. The judge shall then witness the voting procedure as provided in s. 6.87 and shall deliver the ballot to the clerk or agent of the clerk who shall deliver it to the polling place or, in municipalities where absentee ballots are canvassed under s. 7.52, to the municipal clerk as required in s. 6.88.

§ 6.86(1)(b). Simply stated, voter assistance in voting and in return of the ballot is clearly set out in § 6.86(1)(b). When an agent is employed, the agent is identified.

¶112 Another example of the legislature's recognition of agents involved in voting or ballot return is found in Wis. Stat. § 6.86(3)(a) for hospitalized electors. It provides:

> 1. Any elector who is registered and who is hospitalized, may apply for and obtain an official ballot by agent. . . .
>
> 2. If a hospitalized elector is not registered, the elector may register by agent under this

12

> subdivision at the same time that the elector applies
> for an official ballot by agent under subd. 1. . . . .

§ 6.86(3)(a)1. and 2. Once again, when an agent is permitted to be involved in absentee voting, the legislature has clearly defined the factual circumstances that permit it, has identified who may function as an agent and has specified a procedure to follow.

¶113 Wisconsin Stat. § 6.87(5) also permits the use of an agent when the elector is disabled. It provides:

> If the absent elector declares that he or she is unable to read, has difficulty in reading, writing or understanding English or due to disability is unable to mark his or her ballot, the elector may select any individual, except the elector's employer or an agent of that employer or an officer or agent of a labor organization which represents the elector, to assist in marking the ballot . . . .

Once again, when the legislature decided that use of an agent in voting was permissible, it specified the circumstances under which an agent could be employed and defined criteria for performing as an agent in regard to absentee ballots. I do not review the entirety of the statutes that provide for the use of an agent in voting because no party has raised them.

¶114 However, those examples cited above and others I do not cite differ significantly from Wis. Stat. § 6.87(4)(b)1. because § 6.87(4)(b)1. carries none of the factual criteria for permitting the use of an agent and none of the factual safeguards for who may function as an agent. Accordingly, because the text and context of § 6.87(4)(b)1. instruct me to do so, I conclude that no one but the elector may mail an absentee ballot unless the elector and his or her designated agent fit

13

within a different statutory circumstance that explicitly permits it.

### III. CONCLUSION

¶115 The majority opinion concludes that the WEC's memos are invalid because ballot drop boxes are not legal under Wisconsin statutes and because an absentee ballot must be personally delivered by the voter to the municipal clerk at the clerk's office. I agree, and I join the majority opinion. I have written further to explain that, under Wisconsin statutes, it is the elector who shall mail the absentee ballot to the municipal clerk. Accordingly, I respectfully concur.

14

¶116 REBECCA GRASSL BRADLEY, J.    *(concurring).*

> There should be a third Branch which . . . you may call a Governor whom I would invest . . . the whole Executive Power, after divesting it of most of those Badges of Domination called prerogatives.

John Adams, Thoughts on Government (1776), *in* 11 The State Records of North Carolina 325 (1895).

¶117 This court's binding precedent allows WEC——a creature of the legislature authorized only to implement Wisconsin's election laws——to make law by executive fiat, thereby granting it a potent "Badge[] of Domination[.]"  In Trump v. Biden, a majority of this court gave WEC's "advice" the force of law. 2020 WI 91, ¶¶31–32, 394 Wis. 2d 629, 951 N.W.2d 568.  It declared this "advice" is "the rulebook" for elections——never mind what the statutes enacted by the legislature say.  See id. (emphasis added).

¶118 The Trump majority's conversion of WEC's mere "advice" into "the rulebook" flouts the rule of law.  Consistent with constitutional principles, the legislature explicitly declared that "[a] guidance document does not have the force of law." Wis. Stat. § 227.112(3) (2019–20).[1]  Despite the constitutional vesting of lawmaking power in the legislature,[2] Trump requires us to uphold documents produced by executive-branch employees, notwithstanding their inconsistency with the plain meaning of the statutes WEC employees purportedly interpreted.  Trump, 394 Wis. 2d 629, ¶83 (Roggensack, C.J., dissenting); see also Tetra

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019–20 version.

[2] Wis. Const. art. IV, § 1.

1

Tech EC, Inc. v. Wis. Dep't of Revenue, 2018 WI 75, ¶3, 382 Wis. 2d 496, 914 N.W.2d 21 (lead op.) (rejecting the "practice of deferring to administrative agencies' conclusions of law"). Even properly promulgated administrative rules do not have this kind of weight; in the hierarchy of laws, rules fall beneath statutes (if rules may even be called law). I would overrule Trump, but it remains binding precedent under which the memos have the force of law. Because a majority of this court accords them this effect, they must be rules. Because they were not promulgated according to statutorily prescribed procedures, they are invalid for this additional reason.

¶119 This court's decision in Trump exists in tension with Service Employees International Union, Local 1 v. Vos (SEIU), 2020 WI 67, 393 Wis. 2d 38, 946 N.W.2d 35 (Kelly, J., majority op.). SEIU struck down statutes prescribing pre-issuance procedures for guidance documents as facially unconstitutional. Id., ¶88. We described guidance documents as "nothing but the written manifestations of the executive branch's thought processes[.]" Id., ¶122. Under the separation of powers, we denied the legislature a role in policing the executive's thoughts or preventing the executive from sharing its interpretations of law with the public. Id., ¶96 (explaining "[h]e who is to execute the laws must first judge for himself of their meaning" (quoting Alexander Hamilton, Letters of Pacificus No. 1 (June 29, 1793), reprinted in 4 The Works of Alexander Hamilton 438 (Henry Cabot Lodge ed. 1904) (modification in the original)).

2

¶120 Because this court's later decision in Trump gave mere guidance documents the force of law, the legislature necessarily has an interest in regulating them to ensure the executive branch enforces the laws as written. Additionally, the legislature has an interest in the courts upholding the laws the legislature enacts, not elevating guidance written by executive branch employees above the law.

¶121 This court's decision in Trump gave WEC the power to materially alter how elections in this state are conducted——without a single procedural check. Trump should be overruled, but if the court continues to hold the memos need not be promulgated as administrative rules, they should at least be subject to the statutory procedures we struck down in SEIU. As the law stands, WEC's staff have absolute prerogative power. The constitution does not permit such corruption of the carefully calibrated powers among the branches of government.

## I. The Definition of "Rule"

¶122 Wisconsin Stat. § 227.01(13) states, in relevant part:

> "Rule" means a regulation, standard, statement of policy, or general order of general application that has the force of law and that is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency.

Under this definition, a rule must meet five elements: "(1) a regulation, standard, statement of policy or general order; (2) of general application; (3) having the [force] of law; (4) issued by an agency; (5) to implement, interpret or make specific legislation enforced or administered by such agency as

to govern the interpretation or procedure of such agency."[3] <u>Wis. Legislature v. Palm</u>, 2020 WI 42, ¶22, 391 Wis. 2d 497, 942 N.W.2d 900 (quoting <u>Citizens for Sensible Zoning, Inc. v. Dep't of Nat. Res.</u>, 90 Wis. 2d 804, 814, 280 N.W.2d 702 (1979)).

¶123 In this case, no one has argued the memos are not "statements of policy," of "general application," issued by the WEC to "interpret" statutes "enforced or administrated" by the WEC. The parties dispute only the third element, whether the memos have the "force of law."

## II. The Majority's Error in <u>Trump</u>

¶124 Although the memos should not have the force of law, the majority erroneously concluded otherwise in <u>Trump</u>. In that case, Donald Trump, the incumbent President, and his campaign appealed the results of a recount in two Wisconsin counties. 394 Wis. 2d 629, ¶¶5-6 (majority op.). The ballots President Trump sought to strike fell into four categories; two are most relevant in this case. First, he argued "that a form used for in-person absentee voting [wa]s not a 'written application' and therefore all in-person absentee ballots should be struck." <u>Id.</u>, ¶2. Second, President Trump argued "that municipal officials improperly added witness information on absentee ballot certifications, and that these ballots [wer]e therefore invalid." <u>Id.</u>

¶125 As the majority acknowledged, "Wisconsin law provides that a 'written application' is required before a voter can

---

[3] In 2017, the legislature changed "effect of law" to "force of law," which is reflected in the modification of the quote. 2017 Wis. Act 369, § 32.

4

receive an absentee ballot, and that any absentee ballot issued without an application cannot be counted." Id., ¶14 (citing Wis. Stat. §§ 6.84(2), 6.86(1)(ar)). A majority of this court refused to consider whether the form utilized for in-person absentee voting, EL-122, constituted a written application. It noted, "both counties did use an application form created, approved, and disseminated by the chief Wisconsin elections agency." Id., ¶15. The majority emphasized "local election officials used form EL-122 in reliance on longstanding guidance from WEC." Id., ¶25. Therefore, it concluded, "[p]enalizing the voters election officials serve and the other candidates who relied on this longstanding guidance is beyond unfair." Id. "To strike ballots cast in reliance on the guidance now, and to do so in only two counties, would violate every notion of equity that undergirds our electoral system." Id. In Trump, a majority of this court allowed its notions of "equity" and "unfair[ness]" to trump the law.

¶126 Invoking the same rationalizations, the majority declined to examine whether election officials violated a statute by adding missing witness information to absentee ballot certifications. Wisconsin Stat. § 6.87(6d) provides, "[i]f a certificate is missing the address of a witness, the ballot may not be counted." The majority defied this clear textual command because it was concerned that "election officials followed guidance that WEC created, approved, and disseminated to counties in October 2016." Id., ¶18. It continued, "the

5

election officials relied on this statewide advice and had no reason to question it."[4]  Id., ¶26.

¶127 Overall, the majority compared voting——the foundation of free government——to a football game:

> [E]lection officials in Dane and Milwaukee Counties followed the advice of WEC where given. . . .
>
> Our laws allow the challenge flag to be thrown regarding various aspects of election administration. The challenges raised by the Campaign in this case, however, come long after the last play or even the last game; the Campaign is challenging the rulebook adopted before the season began.  Election claims of this type must be brought expeditiously.  The Campaign waited until after the election to raise selective challenges that could have been raised long before the election. . . .  The Campaign is not entitled to relief, and therefore does not succeed in its effort to strike votes and alter the certified winner of the 2020 presidential election.

Id., ¶¶31-32 (emphasis added); see also id., ¶34 (Dallet & Karofsky, JJ., concurring) ("The evidence does show that, despite a global pandemic, more than 3.2 million Wisconsinites performed their civic duty.  More importantly as it relates to this lawsuit, these voters followed the rules that were in place at the time.  To borrow Justice Hagedorn's metaphor, Wisconsin voters complied with the election rulebook.  No penalties were

---

[4] The majority also gave statements from Dane County officials the status of supreme law based on the majority's subjective conception of fairness. Trump v. Biden, 2020 WI 91, ¶27, 394 Wis. 2d 629, 951 N.W.2d 568 (explaining voters in Dane County were "encouraged to utilize" "Democracy in the Park" events and that "17,000 voters did so in reliance on representations that the process they were using complied with the law").

committed and the final score was the result of a free and fair election." (emphasis added)).

¶128 Under Trump, statements from WEC's staff were transformed into super-statutes, trumping the actual law. "Rather than fulfilling its duty to say what the law is, a majority of this court unconstitutionally converts the Wisconsin Elections Commission's mere advice into governing 'law,' thereby supplanting the actual election laws enacted by the people's elected representatives in the legislature and defying the will of Wisconsin's citizens. When the state's highest court refuses to uphold the law, and stands by while an unelected body of six commissioners rewrites it, our system of representative government is subverted." Id., ¶140 (Rebecca Grassl Bradley, J., dissenting).

¶129 The holding in Trump requires a vote cast in reliance on a document produced by the WEC's staff to be counted even if the vote's counting is unlawful under the statute the staff purportedly interpreted. The majority did not ground its decision in constitutional law but in equity.[5] Equitable powers may be broad, but they must always be lawfully exercised. Just

---

[5] Id., ¶73 (Roggensack, C.J., dissenting) ("If WEC has been giving advice contrary to statute, those acts do not make the advice lawful. WEC must follow the law. We, as the law declaring court, owe it to the public to declare whether WEC's advice is incorrect. However, doing so does not necessarily lead to striking absentee ballots that were cast by following incorrect WEC advice. The remedy Petitioners seek may be out of reach for a number of reasons." (quoting Trump v. Evers, No. 2020AP1917-OA, unpublished order (Wis. Dec. 3, 2020) (Roggensack, C.J., dissenting from the denial of the petition for leave to commence an original action)).

this term, we held this court lacks the equitable power to rewrite statutes to enforce a subjective conception of fairness. See Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶¶62, 67, 72, 399 Wis. 2d 623, 967 N.W.2d 469. The Trump majority abandoned this fundamental constraint on the judicial power.

¶130 At the same time the majority aggrandized its "equitable" powers, it ceded its law declaring function to unelected bureaucrats. According to the Trump majority, the judiciary may not even opine on the validity of purported guidance once voters have relied on it. In so ruling, the majority neglected its constitutional duty to declare the meaning of law, instead elevating "guidance[] given by an unelected committee" to the status of supreme law, which must be followed in derogation of enacted statutes. Trump, 394 Wis. 2d 629, ¶108 (Ziegler, J., dissenting); see also State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 436, 424 N.W.2d 385 (1988) ("[I]t is this court's function to develop and clarify the law." (citations omitted)).

¶131 The majority achieved these results by declaring WEC's guidance to be "the rulebook." Trump, 394 Wis. 2d 629, ¶32 (majority op.) (emphasis added). "How astonishing that four justices of the Wisconsin Supreme Court must be reminded that it is THE LAW that constitutes 'the rulebook' for any election——not WEC guidance——and election officials are bound to follow the law, if we are to be governed by the rule of law, and not of men." Id., ¶147 (Rebecca Grassl Bradley, J., dissenting). Notwithstanding SEIU's characterization of guidance as nothing

8

more than executive branch "thought processes," the majority permitted "WEC . . . [to] treat their guidance as if it were law"——and a form of supreme law capable of overriding statutory language. See id., ¶86 (Roggensack, C.J., dissenting) (citing SEIU, 393 Wis. 2d 38, ¶143 (Roggensack, C.J., concurring/dissenting)). The majority's reinvention of guidance as something on par with the constitution is antithetical to the constitutional separation of powers and deprives the people of power over their own government.

¶132 Without offering any explanation, WEC has changed its position on the status of its so-called guidance. WEC did not file a brief in Trump, but in the case's precursor, Trump v. Evers,[6] WEC argued in its brief, "[t]hese challenges come too late and would unconstitutionally punish voters who relied in good faith on election officials' guidance." Not only did WEC argue its guidance was the law, it argued that following the actual law instead of WEC's erroneous interpretations would be unconstitutional. In Trump v. Biden, the majority avoided the constitutional issue, but it nonetheless adopted the thrust of the WEC's argument about fairness by abusing this court's equitable powers. In contrast with its previous position, WEC now characterizes its memos as inert, merely providing information to local officials who are free to ignore them as they please. WEC cannot have it both ways. Either disregarding these documents offends the constitution or they are mere

---

[6] Trump v. Evers was an original action raising the same arguments, which a majority of this court declined to hear just days before Trump v. Biden.

9

"thoughts" of executive-branch employees. This court chose the former in Trump, which means these documents must be properly promulgated, with checks and balances.

¶133 With no convincing response to Trump, WEC primarily argues the memos lack the force of law because they do not require municipal clerks to establish ballot drop boxes. But see Off. of the Special Couns., Second Interim Investigative Report on the Apparatus & Procedures of the Wisconsin Elections System 116 (Mar. 1, 2022) ("Surprisingly, many clerks have expressed to the OSC that they are under the impression that WEC guidance is binding, even when they believe such guidance (say, on drop boxes) is unlawful."). Nonetheless, these memos purport to authorize drop boxes. Under Trump, once a vote is placed in a drop box in reliance on a WEC document that has not been rescinded, it must be counted regardless of whether any statute actually authorizes drop boxes. At least during and after an election, a majority of this court will not consider whether a statute authorizes drop boxes, effectively establishing the memos as the authorizing device.

¶134 As the Wisconsin voters accurately argue, "there are different kinds of laws——some impose duties, others prohibit conduct, and still others authorize conduct. WEC's memos fall into the latter category[.]" Since the time of Sir Edward Coke, "unlawful prerogative legislation" has included both legislation constraining the public and the "alteration" of "legally binding duties" "more generally," including their "relax[ation.]" Philip Hamburger, Is Administrative Law Unlawful? 84 (2014). At

10

a minimum, the Trump decision allowed WEC to relax legal duties. Specifically, the Trump decision endorsed WEC's elimination of duties prescribed by law by counting ballots unlawfully cast in accordance with WEC's extra-legal directions. See Wis. Stat. § 6.84(2) ("Notwithstanding s. 5.01 (1), with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87 (3) to (7) and 9.01 (1) (b) 2. and 4. shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election."). To erase by executive fiat the legislature's duly enacted law is no less an alteration of law merely because it authorizes the unlawful rather than prohibits that which is lawful. See generally Case of Proclamations, [1610] EWHC KB J22, (1611) 12 Co Rep 74, 75, 77 ER 1352 ("[T]he King cannot change any part of the common law, nor create any offence by his proclamation, which was not an offence before, without Parliament. . . . [T]he King by his proclamation of other ways cannot change any part of the common law, or statute law, or the customs of the realm[.]" (citations omitted)).

¶135 WEC also misses another critical point. While the memos may not require municipal clerks to set up ballot drop boxes, if they do so, Memo two regulates their use with clear, unambiguous, and mandatory language. For example, WEC says: "Ballot drop boxes must be secured and locked at all times" and "[c]hain of custody logs must be completed every time ballots

11

are collected."[7] The fact that these requirements attach only if a municipal clerk decides to set up drop boxes makes no difference. Laws often take the form of "if/then" statements. A person may choose not to drive, but if the person chooses to drive, the person is bound to wear a seat belt by a statute with the force of law. Wis. Stat. § 347.48(2m)(b).

¶136 The two propositions resulting from the Trump decision cannot both be true:

1. Documents produced by WEC's staff——not the Wisconsin statutes——comprise "the rulebook" for elections; and

2. WEC's memos are not administrative rules because they do not have the force of law.

No other agency's guidance——or even its properly promulgated rules, for that matter——has been given such pseudo-constitutional force. The Trump decision glorified WEC's purported guidance with a supremacy over real law. This court should overrule its erroneous holding in Trump, restoring WEC's documents to their proper, and quite limited, role.

¶137 The way we described guidance documents in SEIU in 2020 simply cannot be reconciled with the Trump decision of 2021. In SEIU, we correctly concluded guidance documents "are not law, they do not have the force or effect of law, and they provide no authority for implementing standards or conditions." 393 Wis. 2d 38, ¶102 (Kelly, J., majority op.). "They impose no obligations, set no standards, and bind no one." Id. "Functionally, and as a matter of law, they are entirely inert.

---

[7] Emphasis added.

12

That is to say, they represent nothing more than the knowledge and intentions of their authors. It is readily apparent, therefore, that the executive need not borrow any legislative authority, nor seek the legislature's permission, to create guidance documents." Id. (emphasis added).

¶138 Trump transformed purported guidance from "entirely inert" to imperviously potent. See id. Ironically, the legislature enacted pre-issuance procedures for guidance documents precisely because the nature of guidance documents is often misunderstood. "Guidance documents can have a practical effect similar to an unpromulgated rule." Id., ¶142 (Roggensack, C.J., concurring/dissenting). Lawmakers have "frequently heard from constituents, small businesses [and] local government" about "how guidance documents have been abused as a vehicle to actually change the law." Id., ¶143 (quoting Floor Speech by Andre Jacque, Floor Session on 2017 Assembly Bill 1072 (2017 Wis. Act 369), at 3:25, https://wiseye.org/2018/12/05/assembly-floor-session-part-2-8/ (last visited June 25, 2020)). The Trump majority contradicted the SEIU court's treatment of executive agency communications. In SEIU, the court said, "should an administrative agency employee treat a guidance document as a source of authority, that employee would be making a mistake, not defining the nature of a guidance document." Id., ¶134 (Kelly, J., majority op.) (emphasis added). The court itself made a consequential mistake by declaring WEC's guidance not only a source of authority, but the supreme statement of election law.

13

¶139 In his concurrence, Justice Brian Hagedorn attempts to backtrack from the majority opinion he authored in Trump. Whether expressed metaphorically or otherwise, the Trump majority not only labeled WEC's guidance the "rulebook"——it treated it as such, elevating it over statutory law. See supra ¶¶124-26. This concurrence does not advance a new legal analysis; the dissent in Trump explained the upshot of the majority's treatment of WEC's pronouncements on the law, which the majority never disavowed: "the majority commits grave error by according WEC guidance the force of law . . . . How astonishing that four justices of the Wisconsin Supreme Court must be reminded that it is THE LAW that constitutes 'the rulebook' for any election——not WEC guidance——and election officials are bound to follow the law, if we are to be governed by the rule of law, and not of men." Trump, 394 Wis. 2d 629, ¶¶141, 147 (Rebecca Grassl Bradley, J., dissenting). Regardless of what WEC's pronouncements on the law are called, if this court is going to allow them to control an election, they should be promulgated as rules. It was a "serious legal argument" then and remains so now. The majority grievously injured the rule of law in Trump, which the court should acknowledge and correct.[8]

---

[8] Justice Hagedorn now seems to minimize portions of his Trump opinion as dicta. Justice Hagedorn's Concurrence, ¶202 ("the court used the word 'rulebook' in a metaphor regarding challenge flags in football."). Our court does not recognize the concept of dicta, however. "Wisconsin does not consider statements germane to a controversy as dicta." Brandenburg v. Briarwood Forestry Servs., LLC, 2014 WI 37, ¶66 n.2, 354 Wis. 2d 413, 447, 847 N.W.2d 395, 413 (citing Zarder v. Humana Ins. Co., 2010 WI 35, ¶52 n.19, 324 Wis. 2d 325, 782 N.W.2d 682). Metaphors can be a powerful tool in legal writing, but they should be used with care.

## III.  CONCLUSION

¶140 "In Wisconsin, we have a constitution, and it reigns supreme in this state.  'By section 1 of article 4 the power of the state to deal with elections except as limited by the Constitution is vested in the senate and assembly to be exercised under the provisions of the Constitution; therefore the power to prescribe the manner of conducting elections is clearly within the province of the Legislature.'"  Trump, 394 Wis. 2d 629, ¶141 (Rebecca Grassl Bradley, J., dissenting) (quoting State v. Kohler, 200 Wis. 518, 228 N.W. 895, 906 (1930)).  In contravention of the Wisconsin Constitution, the majority's decision in Trump suppresses the power of the people's representatives in a manner reminiscent of a scene from William Shakespeare's Henry VI:

Dick:    I have a suit unto your lordship.

Cade:    Be it a lordship, thou shalt have it for that word.

Dick:    Only that the laws of England may come out of your mouth.

Holland: [to Smith] Mass, 'twill be sore law, then; for he was thrust in the mouth with a spear, and 'tis not whole yet.

Smith:   [to Holland] Nay, . . . it will be stinking law for his breath stinks with eating toasted cheese.

Cade:    I have thought upon it, it shall be so.  Away, burn all the records of the realm:  my mouth shall be the parliament of England.

Holland: [to himself] Then we are like to have biting statutes, unless his teeth be pulled out.

William Shakespeare, Henry VI, Part II, act. 4, sc. 7, ll. 3-16.

15

¶141 When the "mouth" of an employee at the WEC supplants the legislature of Wisconsin, we are left with "sore" or "stinking" laws, irredeemably infected by their promulgation in violation of the constitution by an executive branch agency, and impervious to correction by our constitutional lawmakers. "Bicameralism and presentment are the crucible bills must overcome to become law.  By design, it is much more difficult than rule by dictatorship."  In re Amending Wis. Stat. §§ 48.299 & 938.299 Regulating the Use of Restraints on Child. in Juv. Ct., 2022 WI 26, ¶55 n.11, __ Wis. 2d __, __ N.W.2d __ (Rebecca Grassl Bradley, J., dissenting).

¶142 A majority of this court permits Administrator Megan Wolfe's unilateral declarations regarding election procedures to have the force of law, subject only to judicial review (if the court even bothers to take the case).  "No one man should have all that power."  Kanye West, Power (2010).  "It is not the province [or the prerogative] of a state executive official to re-write the state's election code[.]"  See Carson v. Simon, 978 F.3d 1051, 1060 (8th Cir. 2020) (cited sources omitted).  WEC's "rulebook" should be subject to formal rulemaking under ch. 227.

¶143 "The Founders designed our 'republic to be a government of laws, and not of men . . . bound by fixed laws, which the people have a voice in making, and a right to defend.'" Trump, 394 Wis. 2d 629, ¶149 (quoting John Adams, Novanglus:  A History of the Dispute with America, from Its Origin, in 1754, to the Present Time, in Revolutionary Writings of John Adams (C. Bradley Thompson ed. 2000)).  A majority of

16

this court defenestrated the people's ability to defend their laws. Trump should be overruled to restore the people's supremacy over their public servants. I respectfully concur.

¶144 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this concurrence.

¶145 BRIAN HAGEDORN, J. *(concurring).* The principal issue in this case involves the lawfulness of ballot drop boxes. This case is not about the risk of fraudulent votes being cast or inspiring confidence in elections. This is not about ensuring everyone who wants to vote can, nor should we be concerned with making absentee voting more convenient and secure. Those are policy concerns, and where the law does not speak, they are the business of the other branches, not the judicial branch. This case is about applying the law as written; that's it. To find out what the law is, we read it and give the words of the statutes the meaning they had when they were written.

¶146 The occasion for us to visit this question now is the issuance of two memos by the Wisconsin Elections Commission (WEC) in 2020. Those memos were prepared in response to questions from local clerks administering elections. In the beginning stages of the COVID-19 pandemic, many wondered whether the mail system would be able to return absentee ballots on time. The memos reflect that clerks asked for guidance, including whether ballot drop boxes could be established to receive completed ballots. WEC said yes, and offered detailed best practices on security and logistics and other such administrative questions. The 2020 spring and fall elections came and went; no significant legal challenges to the memos were raised at the time.

¶147 This lawsuit was filed in June 2021. It is a declaratory judgment action under Wis. Stat. § 227.40, which

1

authorizes "judicial review of the validity of a rule or guidance document" issued by a state agency. § 227.40(1). The focus is therefore on what the memos say, and whether their prescriptions are consistent with the law.

¶148 The law says this: absentee ballots can be mailed by the elector or "delivered in person, to the municipal clerk." Wis. Stat. § 6.87(4)(b)1. A careful study of the text, including its history, along with the supporting statutory context, reveals that unstaffed drop boxes for absentee ballot return are not permitted. Rather, this statute specifies return of absentee ballots through two and only two means: mailing by the voter to the municipal clerk, or personal delivery by the voter to the municipal clerk. And personal delivery to the clerk contemplates a person-to-person exchange between the voter and the clerk or the clerk's authorized representative at either the clerk's office or a designated alternate site. Wis. Stat. §§ 5.02(10), 6.855, 6.87(4)(b)1., 6.88(1). The two memos advising otherwise therefore conflict with the law and are properly void.

¶149 In Part II of this concurrence, I address the important procedural questions before us regarding standing and exhaustion of administrative remedies. While I agree that Teigen may bring this claim, I do so on different grounds than those proffered by the majority/lead opinion. In Part III, I provide additional insight into the statutory context and history of the relevant statutes governing where and how absentee ballots may be returned. Finally, in Part IV, I

2

address whether WEC's memos in this case are unpromulgated administrative rules. I conclude they are not because they do not have what the statute requires: the "force of law." See Wis. Stat. § 227.01(13).[1]

¶150 Before diving into the law, I offer two observations. First, the election law statutes we are asked to consider are by no means a model of clarity. Many of the controlling provisions were originally enacted over 100 years ago and have been layered over with numerous amendments since. Reasonable minds might read them differently. Significant questions remain despite our decision in this case, especially as absentee voting has become increasingly common. Although our adjudication of this case will provide some assistance, the public is better served by clear statutes than by clear judicial opinions interpreting unclear statutes. The legislature and governor may wish to consider resolving some of the open questions these statutes present.

¶151 Second, some citizens will cheer this result; others will lament. But the people of Wisconsin must remember that judicial decision-making and politics are different under our constitutional order. Our obligation is to follow the law, which may mean the policy result is undesirable or unpopular. Even so, we must follow the law anyway. To the extent the citizens of Wisconsin wish the law were different, the main

---

[1] I join ¶¶4-10, 12-13, 52-63, 73-85 of the majority/lead opinion.

3

remedy is to vote and persuade elected officials to enact different laws. This is the hard work of democracy.

## I. BACKGROUND

¶152 Weeks before Wisconsin voters went to the polls in April 2020, the COVID-19 pandemic upended much of the world. Election administration was no exception. Due to the risk posed by the virus, exponentially more voters opted to vote by absentee ballot. Complicating things further, the pandemic strained the United States Postal Service, causing fear that it would not be able to deliver absentee ballots on a timely basis. Faced with these constraints, local election officials reached out to WEC for guidance on how they could ensure all absentee ballots would be received in time to be counted. In response to these questions, WEC issued a memo on March 31, 2020, entitled, "FAQs: Absentee Ballot Return Options: USPS Coordination and Drop Boxes." The memo advised in relevant part that "drop boxes can be used for voters to return ballots but clerks should ensure they are secure." It also noted its view that a "family member or another person may also return the ballot on behalf of the voter." The April election proceeded without apparent legal controversy over these matters.

¶153 As preparations began for the November 2020 election, WEC issued another memo. Dated August 19, 2020, it was entitled, "Absentee Ballot Drop Box Information." The document was "intended to provide information and guidance on drop box

4

options for secure absentee ballot return for voters." The memo explained:

> A ballot drop box provides a secure and convenient means for voters to return their by mail absentee ballot. A drop box is a secure, locked structure operated by local election officials. Voters may deposit their ballot in a drop box at any time after they receive it in the mail up to the time of the last ballot collection Election Day. Ballot drop boxes can be staffed or unstaffed, temporary or permanent.

¶154 In June 2021, Waukesha County voters Richard Teigen and Richard Thom (collectively "Teigen") sued WEC "seeking a declaratory judgment regarding the proper construction of state statutes that set forth the legal methods for Wisconsin voters to cast absentee ballots." In his complaint, Teigen contended: "The March 2020 and August 2020 Memos are invalid because they exceed the statutory authority of WEC and because they were promulgated without compliance with statutory procedures." Several parties intervened to defend the memos, including the Democratic Senatorial Campaign Committee (DSCC) and Disability Rights Wisconsin, Wisconsin Faith Voices for Justice, and the League of Women Voters for Wisconsin (collectively "DRW").

¶155 Teigen moved for summary judgment, and the circuit court granted his motion. The circuit court declared the memos invalid because they conflicted with three principles it drew from the statutes: (1) "an elector must personally mail or deliver his or her own absentee ballot, except where the law explicitly authorizes an agent to act on an elector's behalf"; (2) the only ways to cast an absentee ballot under Wis. Stat. § 6.87(4)(b)1. "are for the elector to place the envelope

5

containing the ballot in the mail or for the elector to deliver the ballot in person to the municipal clerk"; and (3) the use of drop boxes "is not permitted under Wisconsin law unless the drop box is staffed by the clerk and located at the office of the clerk or a properly designated alternate site under Wis. Stat. § 6.855." The circuit court also held that the memos were unpromulgated administrative rules, and therefore invalid. Finally, the court enjoined WEC from issuing further interpretations that conflict with Wisconsin law and ordered WEC to withdraw the two memos.

¶156 After the circuit court's ruling, WEC, DRW, and DSCC appealed to the court of appeals. Teigen petitioned this court for bypass. We granted Teigen's petition and received briefing on three issues: (1) whether Teigen's case is procedurally proper, (2) whether WEC's memos are inconsistent with Wisconsin election law, and (3) whether WEC's memos are unpromulgated administrative rules.

## II. PROCEDURAL ISSUES

¶157 The intervening parties raise two procedural challenges they contend forbid Teigen from bringing this suit. DSCC asserts Teigen lacks standing to seek declaratory relief. And DRW argues Teigen's claim must be dismissed because he failed to exhaust the available administrative remedies. Both challenges fall short.

6

## A. Standing

¶158 Teigen seeks declaratory relief under Wis. Stat. § 227.40. That statute permits "judicial review of the validity of a rule or guidance document" issued by a state agency. § 227.40(1). Under such review, the court "shall declare" a rule or guidance document invalid if it violates a constitutional provision, exceeds the agency's statutory authority, or was not issued in compliance with the relevant statutory procedures. § 227.40(4)(a).

¶159 Chapter 227's broad right to declaratory relief is not without limits. In particular, the statute requires that the challenged rule or guidance document have some practical and adverse effect on the party seeking relief:

> The court shall render a declaratory judgment in the action only when it appears from the complaint and the supporting evidence that the rule or guidance document or its threatened application interferes with or impairs, or threatens to interfere with or impair, the legal rights and privileges of the plaintiff.

Wis. Stat. § 227.40(1). In legal parlance, this harm requirement is called standing.

¶160 Standing is the foundational principle that those who seek to invoke the court's power to remedy a wrong must face a harm which can be remedied by the exercise of judicial power. Krier v. Vilione, 2009 WI 45, ¶20, 317 Wis. 2d 288, 766 N.W.2d 517. Some of my colleagues have begun to describe standing in far looser terms. It is a really nice thing to have in a case, they seem to say, but not important at the end of the day. I disagree. We have said standing is not jurisdictional

7

in the same sense as in federal courts and that its parameters are a matter of sound judicial policy. But as Justice Prosser put it, "Judicial policy is not, and has not been, carte blanche for the courts of Wisconsin to weigh in on issues whenever the respective members of the bench find it desirable." Foley-Ciccantelli v. Bishop's Grove Condo. Ass'n, Inc., 2011 WI 36, ¶131, 333 Wis. 2d 402, 797 N.W.2d 789 (Prosser, J., concurring). The judiciary does not serve as a roving legal advisor, answering any questions about the law that may arise. The power we have is "judicial." Wis. Const. art. VII, § 2. The judicial power is the power decide disputes between parties about the law where there is harm to a party that can be remedied through the judicial process. Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶37, 376 Wis. 2d 147, 897 N.W.2d 384. In this sense, the judicial policy buttressing our standing doctrine must stem from our constitutional role. Standing is not a historical relic that should be dispensed with in an age of judicial supremacy. It serves as a vital check on unbounded judicial power. A judiciary that understands its limited and modest role in constitutional governance will take it seriously. Doing so brings our judgment to bear when necessary to resolve legal disputes between parties, but allows many legal debates to take place where the constitution places them: in the court of public opinion and by and between the other branches of government.

¶161 It is also important to give careful attention to standing because the legislature has, in many instances,

8

prescribed the ground rules for judicial review. The rule of law requires that we pay heed to the procedural law enacted by the legislature no less than other laws. Wisconsin Stat. § 227.40(1) is one such statute that imposes a statutory standing requirement. Ordinarily and at common law, citizens could not simply request and obtain a judicial declaration of what the law is in a given scenario. Miller v. Currie, 208 Wis. 199, 203, 242 N.W. 570 (1932) ("Declaratory relief is a creation of the statute and was unknown to the common law."). Section 227.40(1) permits a declaration of rights, but only when a "rule or guidance document or its threatened application interferes with or impairs, or threatens to interfere with or impair, the legal rights and privileges of the plaintiff."

¶162 Thus, the question is whether WEC's memos harm or threaten harm to any of Teigen's "legal rights and privileges." Teigen proffers two legal rights which he contends are implicated by the memos: his right as a taxpayer to challenge unlawful expenditures, and his right as a voter to have election officials comply with election laws.

¶163 We have held that taxpayers have a legal right "to contest governmental actions leading to an illegal expenditure of taxpayer funds." Fabick v. Evers, 2021 WI 28, ¶10, 396 Wis. 2d 231, 956 N.W.2d 856. Teigen maintains he has taxpayer standing because tax dollars supported distribution of the memos and the salaries of WEC staff who prepared them. Taxpayer standing, however, does not extend as broadly as Teigen suggests. This argument, if accepted, would mark a radical

9

departure in the law. It would mean any taxpayer could challenge almost any government action——as long as a government employee devoted some time and attention to the matter. Since that is nearly always true, this would practically eliminate standing as a consideration in most challenges to government action. It is true that the functional distance between an illegal government expenditure and staff time spent drafting a legally erroneous memo may be fuzzy, but it is meaningful and clear from our cases.[2] We have never described taxpayer standing as broadly as Teigen asserts, and we should not grant Teigen's entreaty now.

¶164 Teigen's second argument, however, is more compelling. Teigen argues that Wis. Stat. § 5.06 gives voters like him a

---

[2] Our taxpayer standing cases have always involved an alleged illegal expenditure distinct from staff time. See Hart v. Ament, 176 Wis. 2d 694, 698-99, 500 N.W.2d 312 (1993) (challenging the transfer of management of a county museum); Tooley v. O'Connell, 77 Wis. 2d 422, 439, 253 N.W.2d 335 (1977) (challenging the constitutionality of a taxing provision); Buse v. Smith, 74 Wis. 2d 550, 563, 247 N.W.2d 141 (1976) (challenging a negative-aid provision); Thompson v. Kenosha County, 64 Wis. 2d 673, 679-80, 221 N.W.2d 845 (1974) (challenging the adoption of a countywide assessor system); S.D. Realty Co. v. Sewerage Comm'n of City of Milwaukee, 15 Wis. 2d 15, 21-22, 112 N.W.2d 177 (1961) (challenging construction of a tunnel); Federal Paving Corp. v. Prudisch, 235 Wis. 527, 538, 293 N.W. 156 (1940) (challenging a city resolution directing that payment be made to a paving contractor); Chippewa Bridge Co. v. City of Durand, 122 Wis. 85, 107-08, 99 N.W. 603 (1904) (challenging building of a bridge); J.F. Ahern Co. v. Wis. State Bldg. Comm'n, 114 Wis. 2d 69, 84, 336 N.W.2d 679 (Ct. App. 1983) (challenging the constitutionality of a statue resulting in public expenditures).

statutory right to have local election officials in the area where he lives comply with election laws.[3] That statute says:

> Whenever any elector of a jurisdiction or district served by an election official believes that a decision or action of the official or the failure of the official to act with respect to any matter concerning . . . election administration or conduct of elections is contrary to law . . . the elector may file a written sworn complaint with [WEC] requesting that the official be required to conform his or her conduct to the law, be restrained from taking any action inconsistent with the law or be required to correct any action or decision inconsistent with the law or any abuse of the discretion vested in him or her by law.

§ 5.06(1). According to this statute, if local election officials in the area where a voter lives violate election laws, the voter is empowered to have that conduct abated.[4] This establishes not only a process to compel compliance with the law, but also a legal right held by the voter to have their local election officials follow the law.[5] Other provisions of Chapter 5 work in similar ways.[6]

---

[3] The majority/lead opinion complains Wis. Stat. § 5.06 is not in the petitioner's complaint. But it is in their briefing, which is usually where we look for legal arguments. This was unquestionably an argument Teigen raised.

[4] Additional recourse to a court is available if WEC does not take action on the voter's complaint. See Wis. Stat. § 5.06(2).

[5] The majority/lead opinion misses this distinction, stating that this legal right may only be vindicated by following the procedures set forth in Wis. Stat. § 5.06. But Wis. Stat. § 227.40 provides an additional avenue to vindicate rights conferred in other statutes——including § 5.06——that are threatened by unlawful guidance documents and rules.

[6] See, e.g., Wis. Stat. § 5.08 (empowering voters who believe "that an election official has failed or is failing to

11

¶165 Returning to the standing question here, Wis. Stat. § 227.40(1) first requires the challenge be to a "rule or guidance document." Teigen challenges two memos issued by WEC which all agree are either guidance documents or rules. The statute then inquires whether the memos or their "threatened application interfere[] with or impair[], or threaten[] to interfere with or impair, the legal rights and privileges of the plaintiff." § 227.40(1). As I have explained, Teigen has a legal right protected by Wis. Stat. § 5.06 to have local election officials in his area comply with the law. The only question, then, is whether the memos at least threaten to interfere with or impair Teigen's right to have local election officials comply with the law. I conclude they do.

¶166 The two memos challenged in this case provide local election officials advice on absentee ballot return——advice Teigen contends is unlawful. Regardless of whether the memos are themselves binding on local election officials (a question explored further below), they no doubt carry persuasive force with those administering elections. Many local election officials will follow advice offered by WEC, even when that advice is not legally binding. Indeed, the record in this case

---

comply with any law regulating the conduct of elections or election campaigns" to petition the district attorney with jurisdiction to prosecute the election official's failure); Wis. Stat. § 5.061 (directing voters to file a complaint if they observe a violation of the Help America Vote Act in a national election); Wis. Stat. § 5.081 (authorizing voters to contest perceived violations of § 2 of the Voting Rights Act by petitioning the attorney general, who then is directed to bring a lawsuit on the voters' behalf).

12

reveals that many local election officials employed drop boxes consistent with WEC's advice after the memos issued. If that advice is contrary to law, it stands to reason that many local election officials, including those in Teigen's area, are likely to rely on and implement erroneous advice. Applying the plain terms of Wis. Stat. § 227.40(1), the memos Teigen challenges at the very least threaten to interfere with or impair his right to have local election officials comply with the law. In other words, unlawful WEC guidance can threaten harm to the legal rights and privileges Wis. Stat. § 5.06 provides to voters like Teigen. In this case, the question is whether WEC issued an allegedly unlawful rule or guidance document that makes it likely local election officials will not follow election laws. And on that question, Teigen has sufficiently alleged standing for purposes of § 227.40(1).[7]

¶167 The majority/lead opinion concludes Teigen has standing, but for a different reason. It says Teigen alleged an injury to his constitutional right to vote as recognized in Wis. Stat. § 6.84(1). Majority/lead op., ¶21. That subsection is a statement of legislative policy. It provides in part, "The legislature finds that voting is a constitutional right, the vigorous exercise of which should be strongly encouraged."

---

[7] Significantly, the challenge to Teigen's standing in this case was brought by one of the intervenors, DSCC. WEC——the agency that issued the challenged guidance——expressly declined to join DSCC's standing challenge, even when questioned about the challenge at oral argument. If there is a clear bar to voters challenging allegedly unlawful WEC guidance, WEC itself did not think it worth raising.

13

§ 6.84(1). This statute acknowledges the right to vote protected in Article III, Section 1 of the Wisconsin Constitution: "Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." The majority/lead does not explain why the text of § 6.84(1)——or Article III, Section 1 for that matter——should be read to encompass a right for a voter to challenge any and all election practices. Section 6.84 sets forth rules of construction in a subchapter governing absentee voting. Yet the majority/lead opinion suggests it creates broad voter standing against any election official or WEC by any elector for nearly any purported violation of any election law.[8] Without tethering the analysis to an on-point text, this analysis is unpersuasive and does not garner the support of four members of this court.

### B. Exhaustion

¶168 One procedural matter remains. DRW argues Teigen failed to exhaust his administrative remedies because he did not first challenge the guidance under Wis. Stat. § 5.06. Specifically, DRW points to subsec. (2) of that statute, which says: "No person who is authorized to file a complaint under

---

[8] The majority/lead opinion does not disagree with this characterization of the import of its argument. But it wrongly suggests my analysis under Wis. Stat. § 5.06 does the same. My standing analysis applies only to challenges under Wis. Stat. § 227.40(1) to WEC rules and guidance documents when that guidance threatens to cause local election officials to behave illegally——a legal right protected by § 5.06. The majority/lead opinion brings heat, but little light, to the analysis.

14

[this section] . . . may commence an action or proceeding to test the validity of any decision, action or failure to act on the part of any election official . . . without first filing a complaint under [this section.]" § 5.06(2). DRW also relies on Wis. Stat. § 5.05(2m), which says WEC's "power to initiate civil actions . . . for the enforcement of chs. 5 to 10 or 12 shall be the exclusive remedy for alleged civil violations of chs. 5 to 10 or 12." § 5.05(2m)(k).

¶169 DRW makes reasonable arguments supporting the proposition that these statutes apply to claimed failures of WEC as well. But on balance, I conclude that these statutes do not apply here. Wisconsin Stat. § 5.06 gives WEC an adjudicatory role when an "election official" violates the law. An "election official" in the elections statutes is "an individual who is charged with any duties relating to the conduct of an election." Wis. Stat. § 5.02(4e). However, WEC is separately defined immediately following this as "the elections commission." Wis. Stat. § 5.025. WEC's powers and duties are outlined in § 5.05 and include a direction to "investigate violations of laws administered by the commission" and "prosecute alleged civil violations of those laws." § 5.05(2m)(a). Similarly, § 5.06(4) authorizes WEC to "investigate and determine whether any election official . . . has failed to comply with the law." With respect to both §§ 5.05(2m) and 5.06, DRW's reading would mean WEC is directed to investigate and prosecute itself, which makes little sense. That, along with the statutory distinction between an "election official" and the "commission" lead me to

15

conclude the better reading is that the § 5.06 complaint process does not apply to complaints against acts of WEC as a body.[9]

¶170 In addition, Wis. Stat. § 227.40(1) expressly opens the courthouse doors to those challenging administrative rules or guidance documents: "A declaratory judgment may be rendered whether or not the plaintiff has first requested the agency to pass upon the validity of the rule or guidance document in question." This seems to carve out a particular kind of legal claim——a challenge to rules and guidance documents——and relieves the petitioner of pleading one's case with the agency first.[10] Applying this as written, and in the absence of other contrary arguments, I conclude Teigen was not required to take his case to WEC before seeking judicial relief under § 227.40(1). Thus, Teigen has not failed to exhaust his administrative remedies before bringing this claim. I therefore proceed to the merits.

### III. BALLOT DELIVERY & DROP BOXES

¶171 In the two memos at issue here, WEC advised clerks that absentee voters could cast their ballots via staffed or unstaffed drop boxes, that drop boxes may be placed at clerk's

---

[9] See also Note, Wis. Admin. Code ch. EL 20 (June 2016) (referring to "complaints alleging a violation of election laws by a local election official under s. 5.06, Wis. Stat." (emphasis added)).

[10] The availability of relief under Wis. Stat. § 227.40(1) also means the State has waived its sovereign immunity from this type of claim——i.e., it has consented to suits of this type. See Wis. Const. art. IV, § 27; Lister v. Bd. of Regents of Univ. Wis. Sys., 72 Wis. 2d 282, 291, 240 N.W.2d 610 (1976) (explaining "the state cannot be sued without its consent").

office or elsewhere, and that individuals other than the voter may deliver the voter's absentee ballot to the clerk. These three positions are inconsistent with Wisconsin's election statutes. The law requires that to return an absentee ballot in person, voters must personally deliver their ballot to the clerk or the clerk's authorized representative at either the clerk's office or a designated alternate site. Wis. Stat. §§ 5.02(10), 6.855, 6.87(4)(b)1., 6.88(1). Because WEC's memos conflict with these statutory directives, they are invalid.

## A. Statutory Framework

¶172 Our interpretive task centers on three statutes that together provide the framework for how absentee ballots may be returned and how clerks are to receive them.

¶173 The first one, Wis. Stat. § 6.87(4)(b)1., details how an absentee voter should complete a ballot, and then directs how it should be returned: "The envelope shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." § 6.87(4)(b)1. A "municipal clerk" includes "authorized representatives" of the clerk. Wis. Stat. § 5.02(10).

¶174 Wisconsin Stat. § 6.87(4)(b)1. was originally enacted as part of Wisconsin's earliest comprehensive absentee voting law in 1915. § 1, ch. 461, Laws of 1915. Regarding return of a ballot, the law provided: "Said envelope shall be mailed by such voter, by registered mail, postage prepaid, to the officer issuing the ballot, or if more convenient it may be delivered in

17

person." Id. This wording, plainly read, suggests both the mailing and the delivery must be done by the voter, and directed to the ballot-issuing officer.

¶175 When we construe statutes, we must read the words to mean what they were understood to mean at the time they were enacted, lest we find ourselves rewriting the law. Fortunately, we have clear evidence of how this language was originally read. Less than a year after enactment, the attorney general opined on the precise interpretive question before us today: "'Delivery in person' must mean handed directly by an elector to the officer; it means manual transmission by the one to the other." 5 Wis. Op. Att'y Gen. 591, 593 (1916). When enacted, the text we are considering today was understood to require a person-to-person interaction between the voter and the clerk. So far as I can tell, this reading went unchallenged for 40 years.

¶176 In 1955, this court had occasion to examine the statute in an election dispute. In Sommerfeld v. Board of Canvassers of the City of St. Francis, 18 absentee ballots were returned to the clerk by a third person, and not by the voter. 269 Wis. 299, 300-01, 69 N.W.2d 235 (1955), abrogated in part by Wis. Stat. § 6.84(2). The question in that case concerned whether those ballots should be counted. Id. at 300. All seven justices took it as a given that the law had been violated; the statute required delivery from the voter to the clerk, not through a third person. Id. at 301; id. at 304-05 (Gehl, J., dissenting). The four-justice majority, however, concluded those votes should nonetheless be counted because the statute,

18

though violated, was directory, not mandatory. Id. at 304. Although legally binding, failure to comply with a directory statute may not produce the same consequence as a failure to comply with a mandatory statute. See State v. Rosen, 72 Wis. 2d 200, 207, 240 N.W.2d 168 (1976). The Sommerfeld majority concluded that construing the in-person delivery requirement as mandatory for votes to count could disenfranchise some disabled voters——a result it did not think the legislature meant to produce. 269 Wis. at 303-04. Speaking for three justices, Justice Gehl wrote in dissent that "in person" means "[b]y one's self; with bodily presence," quoting a dictionary. Id. at 304 (Gehl, J., dissenting). Voting by agent was not permitted by this statute, the dissent explained, and votes cast out of compliance with the law should not be counted. Id. at 305 (Gehl, J., dissenting). Sommerfeld's holding that the in-person delivery requirement is directory has since been abrogated. Section 6.84(2) now provides that the requirement "shall be construed as mandatory." What remains is what no justice doubted——that the "in person" delivery requirement means personal delivery, in the flesh, by the voter, to the municipal clerk.

¶177 The legislature has instructed that a "revised statute is to be understood in the same sense as the original unless the change in language indicates a different meaning so clearly as to preclude judicial construction." Wis. Stat. § 990.001(7). There have been three significant iterations of the in-person delivery requirement; none convey a clear change in meaning from

19

the original.[11] No statutory amendments, cases, or Attorney General opinions since give cause to reconsider the long-held view that Wis. Stat. § 6.87(4)(b)1.'s delivery provision requires a person-to-person interaction between the voter and the clerk.

¶178 WEC and DRW counter that because the statute is written in the passive voice, the actor is indeterminate. While that can be true at times, it is not the case here. Wisconsin Stat. § 6.87(4)(b)1. is not agnostic as to the actor. It must be the voter who delivers the ballot. The history confirms this plain reading. WEC also argues that delivery in person does not foreclose delivery by an agent. But statutory history shows this is incorrect as well. In the same comprehensive 1915 law, just two sections after the in-person-delivery requirement, the law speaks of delivery of ballots from clerks to election inspectors "in person or by duly deputized agent." Wis. Stat. § 44m——8 (1915). At the very least, this shows that the legislature knew how to allow delivery by agent, but it chose not to provide for that form of delivery when it enacted this

---

[11] The three versions are as follows:

- 1915: "Said envelope shall be mailed by such voter, by registered mail, postage prepaid, to the officer issuing the ballot, or if more convenient it may be delivered in person." Wis. Stat. § 44m——6 (1915).
- 1965: "The envelope shall be mailed by the elector, postage prepaid, or delivered in person, to the municipal clerk issuing the ballot." Wis. Stat. § 6.87(4) (1967-68).
- Present: "The envelope shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b)1.

20

law. Our decision in Sommerfeld is in accord. I see no evidence supporting a different reading in the current text either.[12]

¶179 In the end, there are two ways to return an absentee ballot under Wis. Stat. § 6.87(4)(b)1. A ballot may be "mailed by the elector," or the voter may deliver it "in person" to the clerk that issued it. § 6.87(4)(b)1. The elector is required—the statute uses the word "shall"—to utilize one of these two options. This contemplates an in-person interaction between the voter and either the municipal clerk or an authorized representative of the clerk.

¶180 We turn next to two statutes that inform where clerks may receive absentee ballots. Wisconsin Stat. § 6.88(1) prescribes what happens after an absentee ballot is received by the clerk:

> When an absentee ballot arrives at the office of the municipal clerk, or at an alternate site under s. 6.855, if applicable, the clerk shall enclose it, unopened, in a carrier envelope which shall be securely sealed and endorsed with the name and official title of the clerk, and [a statement

---

[12] The dissent suggests that the use of the phrase "ballot or ballots" means that one voter may return other voters' ballots. Dissent, ¶240 n.14. This phrasing, however, appears to be holdover from an earlier time when a single voter would cast separate ballots for separate races. The original absentee voting law enacted in 1915 routinely discussed a single voter receiving and casting multiple ballots. See Wis. Stat. § 44m—4 (1915) (providing that the municipal clerk "shall deliver said ballot or ballots to the applicant personally"); Wis. Stat. § 44m—6 (1915) (directing the voter to "mark such ballot or ballots" and that "such ballot or ballots shall then in the presence of such officer be folded by such voter so that each ballot will be separate and so as to conceal the marking").

21

> regarding the contents of the envelope].  . . .  The clerk shall keep the ballot in the clerk's office or at the alternate site, if applicable until delivered [to the appropriate election officials].

This statute ensures a strict chain of custody for ballots. Once a ballot is delivered by the voter, the clerk must take steps to secure it until the time comes to deliver it to the appropriate election officials.  The next subsection, § 6.88(2), provides detailed instructions regarding the secure transfer of ballots from clerks to the proper election officials, ensuring there is no opportunity to tamper with the ballots.  Although neither Wis. Stat. § 6.87(4)(b)1. nor § 6.88(1) expressly state where the voter may deliver his or her ballot, reading the two sections together suggests that delivery must occur either at the clerk's office or an alternate site, if applicable.  Given the detailed ballot custody regulations once the ballot arrives at the clerk's office or an alternate site, legislative silence with respect to ballots delivered anywhere else strongly indicates delivery is not permitted anywhere else.  See Alberte v. Anew Health Care Servs., Inc., 2000 WI 7, ¶17, 232 Wis. 2d 587, 605 N.W.2d 515 (noting that statutory silence "is strong evidence" that the legislature "simply did not contemplate" a particular option).

¶181 Finally, we consider Wis. Stat. § 6.855, which authorizes the aforementioned "alternate sites"——i.e., designated locations besides the clerk's office where elections may be administered.  It provides:

> The governing body of a municipality may elect to designate a site other than the office of the municipal clerk or board of election commissioners as

22

the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election. . . . If the governing body of a municipality makes an election under this section, no function related to voting and return of absentee ballots that is to be conducted at the alternate site may be conducted in the office of the municipal clerk or board of election commissioners.

§ 6.855(1).[13] The strict regulation of alternate sites reinforces the interpretation that ballots must be returned to either the clerk's office or a designated alternate site. Just as the statutes are not agnostic about who delivers ballots, a holistic reading indicates they are not agnostic about where those ballots are delivered either. Ballot custody is carefully regulated at both clerks' offices and at alternate sites. The absence of any careful regulation governing ballot custody elsewhere leads me to conclude that clerks may not take custody of ballots at other locations unless otherwise specified.[14]

---

[13] Governing bodies "may designate more than one alternate site." Wis. Stat. § 6.855(5).

[14] In Trump v. Biden, among other issues, we were asked whether ballots delivered to certified election inspectors at temporary events in Madison parks were valid. 2020 WI 91, ¶¶9, 19-21, 394 Wis. 2d 629, 951 N.W.2d 568. The court concluded this claim was barred by the doctrine of laches and rejected it on that basis. Id., ¶¶10, 29-31. I authored a concurrence offering a preliminary review of the merits of the three claims rejected on the basis of laches, while recognizing that a "comprehensive analysis is not possible or appropriate in light of the abbreviated nature of this review and the limited factual record" in that case. Id., ¶36 (Hagedorn, J., concurring). Regarding the so-called "Democracy at the Park" events, I concluded those events were lawful "based on the record before the court and the arguments presented." Id., ¶57 (Hagedorn, J., concurring). With the benefit of more comprehensive briefing and careful study, I now conclude that the better reading of the statutory scheme is that ballots may only be returned to the clerk's office or a designated alternate site. To be clear,

23

¶182 The respondents argue that the directive to deliver ballots "to the municipal clerk" in Wis. Stat. § 6.87(4)(b)1. does not restrict how the municipal clerk may receive the ballots. If the municipal clerk wishes to receive the ballots in a drop box, the argument goes, that is sufficient. Moreover, other statutes speak of delivery to the office of the municipal clerk, and this one does not. This is perhaps the best argument in the respondents' favor, but it is unpersuasive given the additional statutes that give great care to ballot security and custody. While § 6.87(4)(b)1. says how ballots must be delivered and by whom, Wis. Stat. §§ 6.88(1) and 6.855(1) are best read as limiting and defining where these ballots must be delivered. Section 6.87(4)(b)1. requires in-person delivery by the voter to the municipal clerk. And §§ 6.88(1) and 6.855(1) specify where the municipal clerk can receive those ballots.[15]

¶183 Read together, these statutes direct that when voters choose to return an absentee ballot in person, they must personally deliver their ballot to the clerk or the clerk's authorized representative at either the clerk's office or a designated alternate site. With this interpretation in hand, the next task is to hold WEC's memos up against the statutes.

---

this conclusion would not have changed the court's decision in Trump.

[15] As previously noted, these statutes are far from obvious. While I conclude WEC's interpretation is incorrect, reasonable arguments can be made otherwise, especially with respect to the locations where ballots may be received. This lack of precision and certainty should serve as a call for our political branches to give clearer guidance to voters and those they have asked to administer elections.

24

B. Application

¶184 Teigen focuses his challenge to the March 2020 memo on the following sentence: "A family member or another person may also return the ballot on behalf of the voter." Teigen argues, correctly, that this advice was contrary to Wis. Stat. § 6.87(4)(b)1. WEC's interpretation would permit an agent of the voter to return a ballot on the voter's behalf, contrary to § 6.87(4)(b)1.'s requirement that there be a voter-to-clerk interaction. And although Wis. Stat. § 5.02(10) permits an agent to stand in for the clerk, no statute allows an agent to stand in for the voter in this context.[16] WEC's March 2020 memo is invalid.

¶185 Teigen also seeks a declaration that Wis. Stat. § 6.87(4)(b)1. requires voters to personally place their own ballots in the mail——a declaration the circuit court granted. However, neither WEC's March 2020 memo nor its August 2020 memo offer any advice about how a ballot may be "mailed by the elector." Therefore, there simply is no guidance or rule for us to review under Wis. Stat. § 227.40(1). Accordingly, the court should not and does not make any declaration on that question.[17]

---

[16] Other more specific laws that are not at issue here do permit agents to complete certain tasks on a voter's behalf. See, e.g., Wis. Stat. § 6.875 (absentee voting in certain residential care facilities); Wis. Stat. § 6.86(3) (hospitalized voters).

[17] Justice Roggensack's concurring opinion contends we should decide this question pursuant to our authority under the general Declaratory Judgments Act, Wis. Stat. § 806.04. However, unlike Teigen's other claims, he presents no evidence that WEC has or will violate Wis. Stat. § 6.87(4)(b)1.'s directives on returning ballots by mail. Teigen therefore does

25

¶186 Finally, we turn to WEC's August 2020 memo, which provides guidance on drop boxes. Teigen correctly contends the August 2020 memo improperly advises clerks on how to administer unstaffed drop boxes and drop boxes at locations other than the clerk's office or alternate sites. WEC's guidance is contrary to statute for two reasons. First, unstaffed drop boxes do not satisfy Wis. Stat. § 6.87(4)(b)1.'s requirement that the voter deliver his or her ballot to the municipal clerk or an authorized representative of the clerk. The "in person" interaction the statutes require is absent when a ballot is delivered to an unstaffed drop box. Second, the August memo offers incorrect guidance regarding drop boxes at locations other than the municipal clerk's office or alternate sites. Because Wis. Stat. §§ 6.88(1) and 6.855(1) contemplate delivery occurring at the clerk's office or an alternate site, but not elsewhere, this guidance is contrary to law. Accordingly, WEC's August 2020 memo is also invalid.

¶187 Both WEC's March 2020 and August 2020 memos provide advice that is inconsistent with Wisconsin's election statutes. The court therefore rightly affirms the circuit court's order declaring the memos invalid pursuant to Wis. Stat. § 227.40(1).

### IV. UNPROMULGATED RULE CHALLENGE

¶188 The foregoing analysis is sufficient to resolve the appeal before us. I write further to address Teigen's argument that WEC's memos were unpromulgated administrative rules.

---

not face any threatened harm which a declaration would remedy.

26

¶189 Not all statements that come from a state agency are created equal. Wisconsin's Administrative Procedure Act recognizes this and draws a distinction between what it terms "guidance documents" on the one hand and administrative "rules" on the other. Wis. Stat. § 227.01(3m) & (13).

¶190 A guidance document is just what it sounds like. It is a "formal or official document or communication issued by an agency"——such as "a manual, handbook, directive, or informational bulletin"——that explains how a rule will be implemented or advises the public on how the agency is likely to apply a statute or rule to a class of similarly affected persons. Wis. Stat. § 227.01(3m)(a). "A guidance document does not have the force of law and does not provide the authority for implementing or enforcing a standard, requirement, or threshold." Wis. Stat. § 227.112(3). Agency guidance has existed informally for some time. In 2018, the legislature formalized guidance documents into law as a category of agency communication and added procedures for challenging them. See 2017 Wis. Act 369, §§ 31, 65-71. The legislature also required guidance documents to go through various processes to ensure public input and legislative oversight. Id., § 38. However, a majority of the court concluded several of these statutes were facially unconstitutional——incorrectly so in my view. Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶¶90-91, 393 Wis. 2d 38, 946 N.W.2d 35; id., ¶¶190-212 (Hagedorn, J., concurring in part, dissenting in part). Accordingly, agencies

27

may issue guidance documents without going through the procedures described in Wis. Stat. ch. 227.

¶191 "Rules" are different. The statutory definition of a rule has five elements: a "rule" is (1) "a regulation, standard, statement of policy, or general order," (2) "of general application," that (3) "has the force of law," and (4) "is issued by an agency," to (5) "implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency." Wis. Stat. § 227.01(13). If all five of these elements are satisfied, the rule is subject to numerous promulgation requirements, most notably those described in subchapter II of Wis. Stat. ch. 227. Any rule "promulgated or adopted without compliance with statutory rule-making or adoption procedures" is invalid. Wis. Stat. § 227.40(4)(a).

¶192 Teigen contends that both of WEC's memos were rules under the five-part definition just articulated, and that they are invalid because WEC did not go through the steps required to promulgate a rule. The dispute revolves around whether these memos have the force of law; rules by definition do, guidance documents by definition do not.

¶193 Few cases interpret whether a directive has the force of law. The court of appeals has observed that "[m]aterials developed by an agency as a reference aid for its staff that are couched in terms of advice and guidelines rather than setting forth law-like pronouncements" do not have the force of law and are not rules. County of Dane v. Winsand, 2004 WI App 86, ¶11,

28

271 Wis. 2d 786, 679 N.W.2d 885 (cleaned up). By contrast, materials "using express mandatory language are more than informational." Milwaukee Area Joint Plumbing Apprenticeship Comm. v. DILHR, 172 Wis. 2d 299, 321 n.12, 493 N.W.2d 744 (Ct. App. 1992). In such documents, "the agency speaks with an official voice intended to have the effect of law." Id. How an agency uses a document can also indicate whether it has the force of law. See Barry Lab'ys, Inc. v. Wis. State Bd. of Pharmacy, 26 Wis. 2d 505, 516, 132 N.W.2d 833 (1965). Additional instances where agency materials have been held to have the force of law include "where criminal or civil sanctions can result" or "where the interest of individuals in a class can be legally affected through enforcement of the agency action." Cholvin v. DHSF, 2008 WI App 127, ¶26, 313 Wis. 2d 749, 758 N.W.2d 118 (collecting cases).

¶194 While these cases are helpful, a more fundamental question should be asked: what is a law? To be a law means to be binding and enforceable. Durkee v. City of Janesville, 28 Wis. 464, 471 (1871) (laws are "binding"); State ex rel. Mayer v. Schuffenhauer, 213 Wis. 29, 32, 250 N.W. 767 (1933) (laws "must be followed"). A law orders and forbids and governs and establishes in an authoritative way. See U.S. Fid. & Guar. Co. v. Guenther, 281 U.S. 34, 37 (1930) (defining "law" as "the rules of action or conduct duly prescribed by controlling authority, and having binding legal force"). Here, the statutes specify that a rule must have the "force of law." Wis. Stat. § 227.01(13). And "force" means to "compel by physical means or

29

by legal requirement." Black's Law Dictionary (11th ed. 2019). This suggests something has the force of law if it compels compliance in the same manner as other laws——like a statute or constitutional provision. Administrative rules, once promulgated, bind agencies and regulated entities alike. But guidance documents do not; they inform and compel nothing.

¶195 Also important to our inquiry is the agency we are talking about. Most agencies in state government operate with a wide range of powers and have broad areas of regulatory authority. WEC is different. Wisconsin's method for conducting elections is unlike that of most other states in the union. Our election administration system is highly decentralized. State ex rel. Zignego v. WEC, 2021 WI 32, ¶13, 396 Wis. 2d 391, 957 N.W.2d 208. "Rather than a top-down arrangement with a central state entity or official controlling local actors, Wisconsin gives some power to its state election agency ([WEC]) and places significant responsibility on a small army of local election officials." Id. It is local clerks who have the "primary role in running Wisconsin elections." Id., ¶15. WEC is therefore given authority and oversight over some things, and not others. It may speak authoritatively at times, but not at all times.

¶196 Consistent with this structure, the statutes specific to WEC establish a process by which WEC can adopt formal or informal advisory opinions that "have legal force and effect." Wis. Stat. § 5.05(6a)(a)2. This necessarily means some of WEC's opinions and advice do not have legal force and effect, and therefore, cannot be administrative rules. Statutes must be

30

read together where possible, which means we must interpret the rulemaking "force of law" requirement consistent with the particular circumstances where WEC can issue advisory opinions that "have legal force and effect." See § 5.05(6a)(a)1.

¶197 Considering all of this, the two memos in this case do not have the force of law. The memos are self-labeled guidance documents. They do not purport to be advisory opinions with legal force issued pursuant to Wis. Stat. § 5.05(6a)(a)2. And again, the legislature has specifically stated that WEC's opinions have legal force and effect only under certain circumstances; this is not one of them.

¶198 The language of the memos supports this view. The March 2020 memo is structured as an FAQ document addressed to local election officials. It begins by observing, "Due to the increase in by-mail absentee ballots, clerks have inquired about options for ensuring that the maximum number of ballots are returned to be counted for the April 7, 2020 election." It proceeds to advise clerks on how "to make ballot return more accessible and efficient," and says that it is "recommended" that clerks take various actions to inform voters how their ballots may be returned. The memo then shifts to question-and-answer format, providing advice to clerks regarding drop boxes and how to coordinate ballot return with the U.S. Postal Service. Nothing in the documents suggests there are consequences for noncompliance. No legal interests are altered by the March 2020 memo.

¶199 The August 2020 memo is similarly entitled "Absentee Ballot Drop Box Information" and is addressed to Wisconsin's election officials. The very first line of the memo reveals its limited purpose: "This document is intended to provide information and guidance on drop box options for secure absentee ballot return for voters." It indicates the information in the memo was adapted from an advisory resource developed by the Cybersecurity and Infrastructure Security Agency. It advises election officials regarding various types of drop boxes, where to place them, and how to keep the ballots collected in drop boxes secure. Again, reading the August 2020 memo in full reveals that it is an informational document, designed to educate election officials regarding best practices. It was never legally binding.

¶200 Teigen disagrees. He argues that when the state entity responsible for administering Wisconsin election law says something is permissible——like drop boxes——WEC's imprimatur gives its statement the force of law. But widely-followed advice can still simply be advice. Even general acceptance does not make guidance legally binding or otherwise give it the force of law. Wisconsin's local election officials who lead the charge in election administration have an independent responsibility to read and follow the law. WEC's memos provided advice and best practices which election officials could weigh and consider. Many surely followed that advice. But the memos did not themselves "authorize" drop boxes or any other election practice in a legally binding way.

32

¶201 Justice Rebecca Grassl's Bradley concurrence concludes the memos are administrative rules, a position premised on a confused interpretation of Trump v. Biden, 2020 WI 91, 394 Wis. 2d 629, 951 N.W.2d 568. In that case, the court used the word "rulebook" in a metaphor regarding challenge flags in football. Id., ¶32. The logic of Justice Bradley's concurrence goes like this: The court said WEC's memos were a rulebook, so the court held that WEC memos have the force of law and are administrative rules under Wis. Stat. § 227.01(13).

¶202 To state the obvious, a metaphor is "a figure of speech in which a term or phrase is applied to something to which it is not literally applicable."[18] The challenge flag metaphor came in the concluding paragraph to reinforce the importance of challenging election practices in a timely manner. Yet the concurrence reasons that using the coincidentally similar word "rulebook" means the court determined that all WEC memos are "rules" within the statutory definition. Except the court's decision in Trump did not involve administrative rulemaking at all. It did not cite Wis. Stat. § 227.01(13). And no part of the analysis ascribed the force of law to WEC guidance. Rather, the court's decision addressed whether the Trump campaign was entitled to the relief it sought——the striking of ballots cast in Dane and Milwaukee Counties. Trump,

---

[18] https://www.dictionary.com/browse/metaphor (emphasis added); see, e.g., Thurl Ravenscroft, You're a Mean One, Mr. Grinch, on How the Grinch Stole Christmas (Mercury Records 1966) (referring to Mr. Grinch as a "bad banana" and to his heart as an "empty hole").

394 Wis. 2d 629, ¶32. The court expressly withheld judgment on whether the widely followed WEC guidance was correct or not. Id., ¶30 n.11 ("Our decision that the Campaign is not entitled to the relief it seeks does not mean the legal issues presented are foreclosed from further judicial scrutiny."). Simply put, neither the court's reasoning nor its concluding metaphor suggested all such guidance has the force of law and must be followed. It never even hinted this. The idea that we should ascribe legal force to the two challenged memos in this case because this was somehow settled by a one-sentence metaphor in Trump v. Biden is not a serious legal argument.

¶203 In the end, neither the March 2020 memo nor the August 2020 memo are unpromulgated administrative rules because neither have the force of law. The memos here are guidance documents. They are not subject to Wis. Stat. ch. 227's promulgation requirements and cannot be invalidated on that basis. They can, however, be invalidated for being inconsistent with statute, as we hold today.[19]

V. CONCLUSION

¶204 The majority/lead opinion correctly concludes that WEC's March 2020 and August 2020 memos are invalid because they are inconsistent with Wisconsin law. Wisconsin's election statutes require that to return an absentee ballot in person,

---

[19] Of course, if unstaffed drop boxes are not permitted by statute, as a majority of this court holds today, then no rulemaking authorizing drop boxes would be permissible. An administrative rule cannot make lawful what the statutes forbid.

34

voters must personally deliver their ballot to the clerk or the clerk's authorized representative at either the clerk's office or a designated alternate site. Wis. Stat. §§ 5.02(10), 6.855, 6.87(4)(b)1., 6.88(1). WEC's memos conflict with these statutory requirements by advising that individuals other than the voter may return the voter's ballot to the municipal clerk, that unstaffed drop boxes are permissible, and that drop boxes may be located at places other than the municipal clerk's office or alternate sites. I respectfully concur.

¶205 ANN WALSH BRADLEY, J. *(dissenting).* The right to vote is a "sacred right of the highest character." State ex rel. McGrael v. Phelps, 144 Wis. 1, 15, 128 N.W. 1041 (1910). Yet the majority/lead opinion[1] blithely and erroneously seeks to sow distrust in the administration of our elections and through its faulty analysis erects yet another barrier for voters to exercise this "sacred right."

¶206 Although it pays lip service to the import of the right to vote, the majority/lead opinion has the practical effect of making it more difficult to exercise it. Such a result, although lamentable, is not a surprise from this court. It has seemingly taken the opportunity to make it harder to vote or to inject confusion into the process whenever it has been presented with the opportunity.[2]

¶207 A ballot drop box is a simple and perfectly legal solution to make voting easier, especially in the midst of a

---

[1] I refer to Justice Rebecca Grassl Bradley's opinion as the "majority/lead opinion" because not all of the opinion has been joined by a majority of the court. Justice Brian Hagedorn does not join the following paragraphs: 1-3, 11, 14-51, 64-72, 86, n.29, 87. Justice Hagedorn's concurrence, ¶149 n.1. Thus, those paragraphs do not constitute precedential authority. For further discussion of our procedure regarding lead opinions, see Koss Corp. v. Park Bank, 2019 WI 7, ¶76 n.1, 385 Wis. 2d 261, 922 N.W.2d 20 (Ann Walsh Bradley, J., concurring).

[2] See, e.g., Teigen v. Wis. Elections Comm'n, No. 2022AP91, unpublished order (Wis. S. Ct. Feb. 11, 2022); League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, 357 Wis. 2d 360, 851 N.W.2d 302; Milwaukee Branch of NAACP v. Walker, 2014 WI 98, 357 Wis. 2d 469, 851 N.W.2d 262. Each opinion had vigorous dissents.

1

global pandemic.[3]  But it is apparently a bridge too far for a majority of this court, which once again rejects a practice that would expand voter participation.

¶208 The majority/lead opinion's analysis is flawed in three main ways.  It expands the doctrine of standing beyond recognition, is premised on a faulty statutory interpretation, and without justification fans the flames of electoral doubt that threaten our democracy.

¶209 Accordingly, I respectfully dissent.

I

¶210 At the outset, the majority/lead opinion makes a significant misstep.  It begins with a lengthy discussion of

---

[3] A justice of the United States Supreme Court recently cited the existence of drop boxes in support of the assertion that "[r]eturning an absentee ballot in Wisconsin is . . . easy." Democratic Nat'l Comm. v. Wis. State Legislature, 141 S. Ct. 28, 36 (2020) (Kavanaugh, J., concurring); see also id. at 29 (Gorsuch, J., concurring) ("Never mind that voters may return their ballots not only by mail but also by bringing them to a county clerk's office, or various 'no touch' drop boxes staged locally, or certain polling places on election day.").  After the result in this case, the idea that returning a ballot is so "easy" becomes less defensible.

standing,[4] and in the process extends the doctrine beyond recognition.

¶211 In the majority/lead opinion's view, Teigen[5] has standing "under Wisconsin's permissive, policy-oriented approach toward standing" because he has a "stake in the outcome" and is "affected by the issues in controversy." Majority/lead op., ¶14. Teigen has suffered an "injury in fact" to his constitutional right to vote, the majority/lead opinion says, merely because he alleges that election law was not followed. In accepting Teigen's standing to bring this suit, it further states: "the failure to follow election laws is a fact which forces everyone . . . to question the legitimacy of election results." Id., ¶25.

_____

[4] The majority/lead opinion additionally devotes a great deal of ink to analyzing whether Teigen needed to file a complaint with WEC under Wis. Stat. § 5.06 before commencing this suit. See majority/lead op., ¶¶37-51. It determines that this statute does not require a complaint to be filed against WEC, in part because such a procedure would cause WEC to "be a judge in [its] own cause." Id., ¶47. Rather than engage with each point the majority/lead opinion makes in its discussion, I simply observe that an agency reviewing its own decision at the beginning of an appeal process is a common occurrence and does not present the anomaly that the majority/lead opinion paints. See Wis. Stat. § 283.63 (providing for review by the Department of Natural Resources of a permit denial, modification, termination, or revocation decision made by the Department)

[5] The majority/lead opinion refers to Teigen and Thom as the "Wisconsin voters" throughout its opinion. This could be misleading to the reader. True enough, Teigen and Thom are voters who live in Wisconsin. But the use of the term could lead the reader to believe that the plaintiffs here represent a wider swath of people than they actually do. Thus, I refer to the two plaintiffs collectively as "Teigen."

3

¶212 The majority/lead opinion attempts to create a free-for-all. It delineates no bounds whatsoever on who may challenge election laws. Instead, it relies on broad pronouncements regarding the import of our election laws and their general effect on all people. But just because all people are subject to a law does not mean that any and all people are entitled to challenge it.

¶213 Indeed, "Courts are not the proper forum to air generalized grievances about the administration of a governmental agency." Cornwell Personnel Assocs., Ltd. v. DILHR, 92 Wis. 2d 53, 62, 284 N.W.2d 706 (Ct. App. 1979) (citations omitted); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 573-74 (1992) ("We have consistently held that a plaintiff raising only a generally available grievance about government——claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large——does not state an Article III case or controversy.").

¶214 Yet a "generalized grievance" is just what Teigen brings to this court. The majority/lead opinion says that Teigen's "rights and privileges as [a] registered voter[]" give him standing to bring this action challenging the statewide administration of elections. Majority/lead op., ¶14. Taken to its logical conclusion, the majority/lead opinion indicates that any registered voter would seemingly have standing to challenge any election law. The impact of such a broad conception of

4

voter standing is breathtaking and especially acute at a time of increasing, unfounded challenges to election results and election administrators.[6]

¶215 Rather than opening wide the barn doors, the doctrine of standing is important "because it reins in unbridled attempts to go beyond the circumscribed boundaries that define the proper role of courts." Fabick v. Evers, 2021 WI 28, ¶92, 396 Wis. 2d 231, 956 N.W.2d 856 (Ann Walsh Bradley, J., dissenting).[7] "Unbridled" certainly describes the majority/lead opinion's approach to standing in this case. It follows a standard untethered to any limiting principle, which in effect renders the concept of standing merely illusory.

II

¶216 I turn next to the substance of the majority/lead opinion's statutory interpretation.[8] Even assuming Teigen has standing to bring this claim, the majority/lead opinion falters in its examination of the relevant statutes.

---

[6] See Election Officials Under Attack: How to Protect Administrators and Safeguard Democracy, Brennan Center for Justice and the Bipartisan Policy Center, https://www.brennancenter.org/our-work/policy-solutions/election-officials-under-attack (June 16, 2021).

[7] Justice Hagedorn's concurrence likewise recognizes that the doctrine of standing "serves as a vital check on unbounded judicial power." Justice Hagedorn's concurrence, ¶160.

[8] Although I address the majority/lead opinion's statutory analysis, my critique also largely applies to Justice Hagedorn's concurrence, which reaches the same conclusion.

A

¶217 Wisconsin Stat. § 6.87 addresses absentee voting procedure. Subd. (4)(b)1., specifically at issue here, provides in relevant part: "The envelope shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots."

¶218 In the majority/lead opinion's view, "[n]othing in the statutory language detailing the procedures by which absentee ballots may be cast mentions drop boxes or anything like them." Majority/lead op., ¶54. Further, it interprets the phrase "to the municipal clerk" to mean "mailing or delivering the absentee ballot to the municipal clerk at her office" or an alternate site under Wis. Stat. § 6.855. Id., ¶62.

¶219 The majority/lead opinion's interpretation of Wis. Stat. § 6.87(4)(b)1. ignores an important distinction. Section 6.87(4)(b)1. uses the phrase "municipal clerk." It does not say "municipal clerk's office."

¶220 This is important because elsewhere the Wisconsin Statutes are replete with references to the "office of the municipal clerk," the "office of the clerk," or the "clerk's office." Not only is such an "office" referenced, but it is specified as a place where a delivery or an action takes place. See, e.g., Wis. Stat. §§ 5.81(3) (discussing ballots and envelopes "voted in person in the office of the municipal clerk"); 6.18 (requiring that a form "shall be returned to the municipal clerk's office"); 6.32(2) (setting forth that an elector "appear at the clerk's office"); 6.855(2) (addressing

6

the display of a notice "in the office of the clerk"); 12.035(3)(d) (discussing a "building containing the office of the municipal clerk").[9]

¶221 From these statutes we can take the principle that the office of the municipal clerk is a location. Indeed, a person "appear[s]" at a location. See Wis. Stat. § 6.32(2). That the "office of the municipal clerk" refers to a location is confirmed by the fact that the statutes refer to it as "contain[ed]" within a "building." See Wis. Stat. § 12.035(3)(d).

¶222 We also know that a "municipal clerk" under the statutes is distinct from the "office of the municipal clerk," because "municipal clerk" is specifically defined as "the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives." Wis. Stat. § 5.02(10). In other words, the "municipal clerk" is a person, and the "office of the municipal clerk" is a location.

¶223 "If a word or words are used in one subsection but are not used in another subsection, we must conclude that the legislature specifically intended a different meaning." Responsible Use of Rural and Agr. Land v. Pub. Serv. Comm'n, 2000 WI 129, ¶39, 239 Wis. 2d 660, 619 N.W.2d 888. If the

---

[9] Further examples abound. See Wis. Stat. §§ 6.15(2)(bm), 6.28(1)(b), 6.29(2)(a), 6.30(4), 6.32(3), 6.35(3), 6.45(1m), 6.47(2), 6.50(1), 6.55(2)(cm), 6.56(4), 6.86(1)(a)2., 6.86(3)(c), 6.87(3)(a), 6.87(4)(b)4., 6.88(1), 6.97(3)(b), 7.41(1), 7.53(1)(b), 7.53(2)(d), 8.10(6)(c), 12.03(1), 12.03(2)(a)2., 12.035(3)(c).

7

legislature wanted to require return of a ballot to the clerk's office, it certainly could have done so, as it did in the litany of provisions using such language. See, e.g., Southport Commons, LLC v. DOT, 2021 WI 52, ¶31, 397 Wis. 2d 362, 960 N.W.2d 17 (indicating that when the legislature wants to accomplish an object in a manner used in other areas of the statutes, "it knows how to do so").

¶224 But the legislature did not do that. Instead, it indicated that the ballot be delivered "to the municipal clerk," not to the clerk's office. Conflating "municipal clerk" with "office of the municipal clerk" is not——as the majority/lead opinion claims——the "fairest interpretation" of the statute. See majority/lead op., ¶62. Instead, it is a rank distortion of the statutory text.

¶225 Can delivery to a drop box constitute delivery "to the municipal clerk?" Absolutely. A drop box is set up by the municipal clerk, maintained by the municipal clerk, and emptied by the municipal clerk. This is true even if the drop box is located somewhere other than within the municipal clerk's office. As stated, the "municipal clerk" in the statutes is a person, and the "office of the municipal clerk" is a location. Applying this principle, there is nothing in the statute that even hints that unstaffed drop boxes are impermissible. Rather, a drop box, which the clerk or the clerk's designee[10] sets up,

---

[10] As stated, "municipal clerk" is statutorily defined as "the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives." Wis. Stat. § 5.02(10) (emphasis added). Thus, this job need not be accomplished by a single person.

8

maintains, and empties, is simply another way to deliver a ballot "to the municipal clerk."[11] The majority/lead opinion's attempt to avoid the statute's plain language fails.

¶226 The majority/lead opinion additionally invokes Wis. Stat. § 6.855 in an attempt to "show[] the unlawfulness of ballot drop boxes." Id., ¶56. Again, the majority/lead opinion flounders. This statute simply does not apply to drop boxes and tells us nothing about whether their use is permissible.[12]

¶227 To explain, Wis. Stat. § 6.855 establishes the procedures by which municipal clerks can set up "alternate absentee ballot sites." These are commonly referred to as early

---

[11] The circuit court in this case drew a distinction between staffed and unstaffed drop boxes, determining that drop boxes are not permitted "unless the drop box is staffed by the clerk and located at the office of the clerk or a properly designated alternate site." See majority/lead op., ¶9. Yet the majority/lead opinion does not address this distinction, raising more questions than it answers. Does this distinction retain vitality? If so, does a drop box located directly outside the front door to a clerk's office count as a "staffed" drop box? Must a staff member from the clerk's office be standing outside next to the drop box? Or is it sufficient if the clerk can see the box from a window while inside the office? Once again, the majority/lead opinion leaves municipal clerks and voters guessing.

[12] Justice Hagedorn's concurrence also brings Wis. Stat. § 6.88 into the analysis. Justice Hagedorn's concurrence, ¶180. That statute likewise has no bearing on how ballots may be "delivered" to the municipal clerk. Rather, § 6.88(1) addresses what occurs when an absentee ballot "arrives at the office of the municipal clerk" (emphasis added), and subsec. (2) concerns what a clerk does with ballots after they are "received" by the clerk. In other words, § 6.88 speaks only of what happens to a ballot after it has been delivered to the municipal clerk, not how it gets there.

in person absentee voting, or simply "early voting." Section 6.855(1) provides:

> The governing body of a municipality may elect to designate a site other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality <u>may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election</u>."

(Emphasis added).

¶228 On its face, Wis. Stat. § 6.855 sets forth that alternate voting sites "must be a location not only where voters may return absentee ballots, but also a location where voters 'may request and vote absentee ballots.'" <u>Trump v. Biden</u>, 2020 WI 91, ¶56, 394 Wis. 2d 629, 951 N.W.2d 568 (Hagedorn, J., concurring). Thus, as the majority/lead opinion acknowledges, "[b]allot drop boxes are not alternate absentee ballot sites under Wis. Stat. § 6.855 because a voter can only return the voter's absentee ballot to a drop box, while an alternate site must also allow voters to request and vote absentee at the site." Majority/lead op., ¶57.

¶229 The majority/lead opinion reads into Wis. Stat. § 6.855 an implication beyond the statute's language. Although the majority/lead opinion correctly acknowledges that § 6.855 does not describe drop boxes, it seeks support for its result in the assertion that "[t]he legislature enacted a detailed statutory construct for alternate sites" while at the same time "the details of the drop box scheme are found nowhere in the statutes." <u>Id.</u>, ¶58. This argument falls flat for the same reason the majority/lead opinion's statutory analysis of Wis.

10

Stat. § 6.87(4)(b)1. fails: the legislature did not include a detailed scheme for drop boxes in the statutes because it did not need to do so. As analyzed above, § 6.87(4)(b)1. already authorizes them.

¶230 Election administration in Wisconsin is decentralized. State ex rel. Zignego v. Wis. Elections Comm'n, 2021 WI 32, ¶13, 396 Wis. 2d 391, 957 N.W.2d 208. "Rather than a top-down arrangement with a central state entity or official controlling local actors, Wisconsin gives some power to its state election agency (the Commission) and places significant responsibility on a small army of local election officials." Id. Indeed, "Municipal clerks are the officials primarily responsible for election administration in Wisconsin." Id., ¶15.

¶231 This significant responsibility is codified in the statutes. Wisconsin Stat. § 7.15(1) specifically provides: "Each municipal clerk has charge and supervision of elections and registration in the municipality. The clerk shall perform the following duties and any others which may be necessary to properly conduct elections or registration . . . ." See also Wis. Stat. § 60.33(4)(a) ("The town clerk shall . . . [p]erform the duties required by chs. 5 to 12 relating to elections.").

¶232 Instead of an inexorable command that unstaffed drop boxes are banned, Wis. Stat. § 6.87(4)(b)1. gives some discretion to municipal clerks to determine how best to run elections in their respective jurisdictions. By using the "municipal clerk" language rather than the "office of the municipal clerk" verbiage, the legislature necessarily entrusts

11

some discretion to the municipal clerk in a manner consistent with the entirety of the statutory scheme. See DeWitt v. Ferries, 2018 WI 117, ¶26, 385 Wis. 2d 1, 921 N.W.2d 188 (indicating that statutes are to be read in context, not in isolation but as part of a whole, and in relation to the language of closely-related statutes).

¶233 The circuit court here allowed the use of staffed drop boxes in the office of a municipal clerk. But what good is this for a clerk in a rural area who may work only a few hours a week? In this context, it certainly makes sense for those clerks to have at least the discretion to place a drop box outside the office or in another location so voters can drop off absentee ballots outside of the limited hours the clerk's office is actually open.

¶234 Instead of this common sense reading that is consistent with the decentralized manner in which Wisconsin elections are run, the majority/lead opinion severely limits the return of absentee ballots in all municipalities regardless of their circumstances. Some voters will be unlucky enough to live in a jurisdiction without a full-time clerk, and others will be forced to go to only a single location to return their ballots where they previously had numerous options. Does the majority/lead think everyone in this state lives in urban areas with full-time clerks and standard office hours? If so, it ignores reality and puts rural voters at a disadvantage.

¶235 Our statutes and case law indicate that election administration in Wisconsin is not one-size-fits-all. See

12

Zignego, 396 Wis. 2d 391, ¶13.  Yet the majority/lead opinion fails to recognize this, making election administration more onerous for local clerks and the exercise of the franchise more difficult for voters.

B

¶236 Contravening the plain language of the statute to prohibit ballot drop boxes is bad enough.  But the majority/lead opinion further erroneously determines that a voter cannot have a family member or friend return their ballot to the municipal clerk for them.  Majority/lead op., ¶83.

¶237 The brunt of this holding will fall on those who are homebound.  If a voter is disabled or sick, and someone the voter lives with is taking their own absentee ballot to the clerk's office, that roommate, spouse, or family member can't, under the majority/lead opinion's analysis, simply pick up another validly voted ballot from the kitchen table and take it with them.

¶238 As absurd as that sounds in practice,[13] the majority/lead opinion's statutory interpretation to reach that result fares no better.  Although at first blush the majority/lead opinion's interpretation may seem reasonable, a closer examination of the text reveals otherwise.  Section

---

[13] Not to mention that the majority/lead opinion's conclusion arguably violates federal law related to voters with disabilities.  See 52 U.S.C. § 10508 ("Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.").

13

6.87(4)(b)1. addresses only the manner for returning a ballot ("in person") and not <u>who</u> may return it.

¶239 Wisconsin Stat. § 6.87(4)(b)1., as stated above, provides: "The envelope shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." As relevant to this issue, we focus on the placement of the words within the statute.

¶240 Section 6.87(4)(b)1. does not say "delivered in person by the elector." It says "delivered in person."[14] The majority/lead opinion transposes the phrase "by the elector," placing it not where the legislature placed it (after "mailed"), but instead writing it into the statute where the majority/lead opinion prefers it to be placed in order to bolster its erroneous conclusion. Yet, the statute says nothing at all about who may return a ballot to the municipal clerk. Rather, the statute is written in the passive voice and does not indicate who the actor is who must deliver the ballot "in person." <u>See Juneau Cnty. Star-Times v. Juneau County</u>, 2011 WI App 150, ¶15, 337 Wis. 2d 710, 807 N.W.2d 655.

¶241 The majority/lead opinion violates a cardinal rule of statutory interpretation by writing words into the statute the legislature did not write. <u>See Dawson v. Town of Jackson</u>, 2011

---

[14] Further bolstering this interpretation of the statute is the fact that the legislature used the plural in indicating that a completed ballot must be "delivered in person, to the municipal clerk issuing the ballot <u>or ballots</u>." Wis. Stat. § 6.87(4)(b)1. (emphasis added). Why would the legislature use the plural if it did not contemplate that one person could return an additional ballot?

14

WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316. A voter's spouse, child, or roommate can deliver a ballot "in person" just as the voter can, and the statute draws no distinction. Yet the majority/lead opinion manufactures one, going outside the words the legislature wrote to place yet another obstacle in the way of voters simply seeking to exercise their cherished right to vote.[15]

_____

[15] As I end my discussion of this issue, I emphasize the limited nature of the court's determination. It applies to absentee ballots delivered in person to the municipal clerk, not to a family member or a friend placing a ballot in the mail on behalf of a voter. See majority/lead op., ¶5; Justice Hagedorn's concurrence, ¶185.

However, despite its insistence that it is not addressing the issue, the majority/lead opinion proceeds to go on at length about Disability Rights Wisconsin's argument regarding federal law on ballot assistance and criticizes the argument as "undeveloped." See majority/lead op., ¶¶84-86. As the majority/lead opinion acknowledges, this argument is directed at the "impact of the circuit court's declarations on disabled voters who may be physically unable to vote if someone cannot place an absentee ballot in the mail on a voter's behalf." Id., ¶86. Accordingly, this sojourn is completely unnecessary to both the majority/lead opinion's holding and its analysis. I highlight, however, the majority/lead opinion's own statement that we do not decide "whether the law permits a voter's agent to place an absentee ballot in the mail on the voter's behalf." Id., ¶5; see also Justice Hagedorn's concurrence, ¶185 (explaining that "the court should not and does not make any declaration on [this] question").

Undeterred by the majority/lead opinion's statement that the WEC memos at issue "do not address" the issue, Justice Roggensack's concurrence forges ahead with that analysis anyway. Rather than engage on an issue that is not properly before the court in the first place, I simply observe that Justice Roggensack's concurrence is not the law, and that the issue of whether a family member or other person may place an absentee ballot in a mailbox on behalf of a voter is not resolved by this opinion.

15

III

¶242 As a final point, I address the majority/lead opinion's language casting doubt on the results of past elections conducted with drop boxes. The majority/lead opinion claims that "[t]he illegality of these drop boxes weakens the people's faith that the election produced an outcome reflective of their will." Majority/lead op., ¶24; see also id., ¶25 ("[T]he failure to follow election laws is a fact which forces everyone . . . to question the legitimacy of election results."). It suggests that the use of drop boxes leaves electoral results "in question." Id., ¶24.

¶243 Nonsense. First, accepting the majority/lead opinion's assertion requires either willful ignorance to the origin of the WEC August 19, 2020 memo or a lack of trust in its source. The August 19, 2020 memo was "adapted from a resource developed as part of the Cybersecurity and Infrastructure Security Agency (CISA) Elections Infrastructure Government Coordinating Council and Sector Coordinating Council's Joint COVID Working Group." CISA is operated under the auspices of the Department of Homeland Security. Drop boxes were apparently secure enough for the federal Department of Homeland Security, yet the majority/lead opinion still contends that they cause people to lose faith in our elections.

¶244 There is no evidence at all in this record that the use of drop boxes fosters voter fraud of any kind. None. And there certainly is no evidence that voters who used drop boxes

16

voted for one candidate or party or another, tilting elections either direction.

¶245 It is true that the legislature has referred to absentee voting as a "privilege exercised wholly outside the traditional safeguards of the polling place" that must be "carefully regulated to prevent the potential for fraud or abuse." Wis. Stat. § 6.84(1). But despite the majority/lead opinion's bald assertion that voter fraud is actually a "serious problem," majority/lead op., ¶71, studies have demonstrated extremely low rates of voter fraud in United States elections.[16]

¶246 The majority/lead opinion's sky-is-falling rhetoric not only defies the facts, but also is downright dangerous to our democracy. Absent evidence that supports its statements, the majority/lead opinion still lends its imprimatur to efforts to destabilize and delegitimize recent elections.

¶247 But concerns about drop boxes alone don't fuel the fires questioning election integrity. Rather, the kindling is primarily provided by voter suppression efforts and the constant

---

[16] See, e.g., Andrew C. Eggers, Haritz Garro, and Justin Grimmer, No evidence for systematic voter fraud: A guide to statistical claims about the 2020 election, Proc. of the Nat'l Acad. of Sci., https://www.pnas.org/doi/10.1073/pnas.2103619118 (Nov. 2, 2021); Justin Levitt, The Truth About Voter Fraud, Brennan Center for Justice, https://www.brennancenter.org/our-work/research-reports/truth-about-voter-fraud (Nov. 9, 2007); see also Trump v. Biden, 2020 WI 91, ¶59, 394 Wis. 2d 629, 951 N.W.2d 568 (Hagedorn, J., concurring) ("At the end of the day, nothing in this case casts any legitimate doubt that the people of Wisconsin lawfully chose Vice President Biden and Senator Harris to be the next leaders of our great country.").

17

drumbeat of unsubstantiated rhetoric in opinions like this one, not actual voter fraud.[17]

¶248 For the foregoing reasons, I respectfully dissent.

¶249 I am authorized to state that Justices REBECCA FRANK DALLET and JILL J. KAROFSKY join this dissent.

---

[17] As should be clear by now, this dissent's analysis is neither an "ad hominem attack" nor "political talking points" as the majority/lead opinion claims. See majority/lead op., ¶86 n.29. This court's poor track record on voting rights is well-established and the flaws in the majority/lead opinion's analysis that lead to an additional "barrier" to voting are set forth in this opinion.

Nevertheless, footnote 29 of the majority/lead opinion takes this dissent to task and ridicules Justice Jill Karofsky for joining it, while at the same time partaking in the very conduct about which it is complaining.

What comes to mind is the adage of psychological projection——"the pot calling the kettle black." Rather than detailing in response the several and recent examples illustrating the adage (and risking the undesirable escalation of hyperbole), I observe only that there is an obvious difference between attacking a public servant as a "tyrant" for merely doing her job, which elicited Justice Karofsky's objection in Becker, and simply pointing out this court's poor recent track record when it comes to protecting voting rights, as does this dissent. See Becker v. Dane County, 2022 WI __, ¶44, __ Wis. 2d __, __ N.W.2d __.